JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
*Class Counsel for All Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### (Western Division)

| | |
|---|---|
| ALLEN L. MUNRO, DANIEL C. WHEELER, EDWARD E. VAYNMAN, JANE A. SINGLETON, SARAH GLEASON, AND REBECCA A. SNYDER, individually and as representatives of a class of participants and beneficiaries on behalf of the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan, | Civil Action No. 16-cv-6191<br><br>COMPLAINT—CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, USC RETIREMENT PLAN OVERSIGHT COMMITTEE, AND LISA MAZZOCCO, | |
| *Defendants.* | |

1.     Plaintiffs Allen L. Munro, Daniel C. Wheeler, Edward E. Vaynman, Jane A. Singleton, Sarah Gleason, and Rebecca A. Snyder, individually and as representatives of a class of participants and beneficiaries of the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan (herein collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendants University of Southern California, the USC Retirement Plan Oversight Committee, and Lisa Mazzocco for breach of fiduciary duties under ERISA.[1]

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

**COMPLAINT**

2.      The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries, and to ensure that Plan expenses are reasonable and that the Plans' investments are prudent.

3.      The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plans, have tremendous bargaining power to demand low-cost administrative and investment management services. Instead of leveraging the Plans' bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plans, and retained high-cost and poor-performing investments compared to available alternatives.

4.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject

**COMPLAINT**

Plans are administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

**PARTIES**

**University of Southern California Retirement Savings Program**

7.     The University of Southern California ("USC") offers eligible faculty and staff participation in what it refers to as the University of Southern California Retirement Savings Program (the "Program"). The Program includes two underlying plans: the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan.

8.     Nearly every employee eligible to participate in the Program has an individual account in both the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan.

9.     Participants in the University of Southern California Tax-Deferred Annuity Plan contribute to their individual account through payroll deductions, whereas participants in the University of Southern California Defined Contribution Retirement Plan receive contributions from USC.

**University of Southern California Defined Contribution Retirement Plan**

10.     The University of Southern California Defined Contribution Retirement Plan (the "DC Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

11.     The DC Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

12.     The DC Plan provides for retirement income for certain faculty and staff of USC. That retirement income depends upon contributions made on behalf of each employee by his or her employer, matching contributions made on behalf of

- 3 -

**COMPLAINT**

qualifying employees, and performance of investment options net of fees and expenses.

13.     As of December 31, 2014, the DC Plan held $2.19 billion in assets and had 28,423 participants with account balances. It is one of the largest defined contribution plans in the United States. Plans of such great size are commonly referred to as "jumbo plans."

**University of Southern California Tax-Deferred Annuity Plan**

14.     The University of Southern California Tax-Deferred Annuity Plan (the "TDA Plan") is a defined contribution plan, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

15.     The TDA Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

16.     The TDA Plan provides for retirement income for certain faculty and staff of USC. That retirement income depends upon deferrals of employee compensation and performance of investment options net of fees and expenses.

17.     As of December 31, 2014, the TDA Plan held $2.25 billion in assets and had 29,758 participants with account balances. This "jumbo plan" is also one of the largest defined contribution plans in the United States.

18.     With total assets well over $1 billion, the DC Plan and the TDA Plan are in the top 1% of all defined contribution plans in the United States based on the total assets that filed a Form 5500 with the Department of Labor.

19.     The Plans allow participants to designate investment options into which their individual accounts are invested. Defendants exercised exclusive and discretionary authority and control over the investment options that are included in the Plans.

//

//

//

- 4 -

**COMPLAINT**

**Plaintiffs**

20.     Allen L. Munro resides in Manhattan Beach, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

21.     Daniel C. Wheeler resides in El Monte, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

22.     Edward E. Vaynman resides in Santa Monica, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

23.     Jane A. Singleton resides in Azusa, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

24.     Sarah Gleason resides in Los Angeles, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

25.     Rebecca A. Snyder resides in Torrance, California, and is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

**Defendants**

26.     USC is a non-profit corporation organized under California law with its principal place of business in Los Angeles, California. Upon information and belief, USC is the fiduciary with ultimate responsibility for the control, management, and administration of the Plans, in accordance with 29 U.S.C. §1102(a). USC is the Plan administrator for both Plans under 29 U.S.C. §1002(16)(A)(i), and has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to properly to carry out such responsibilities,

**COMPLAINT**

including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

27.  USC is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

28.  The USC Retirement Plan Oversight Committee ("Committee") has been delegated certain fiduciary responsibilities over the administration and investment of the Plans' assets, including: selecting and monitoring the Plans' investment options; selecting vendors and implementing contractual service arrangements; developing investment objectives, policies, and procedures for the Plans; and monitoring and controlling investment and administrative fees paid from the Plans to ensure those fees are reasonable for the services provided.

29.  Lisa Mazzocco is the current chair of the Committee and serves as USC's Chief Investment Officer. In addition to her role as a fiduciary committee member, she advises the investment and finance committee of the USC Board of Trustees with respect to USC's endowment performance and directly reports to the President of USC.

30.  The Committee, its individual members, and Ms. Mazzocco, are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have discretionary authority or discretionary responsibility in administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

//

- 6 -

**COMPLAINT**

31.     Because the Committee and its individual committee members, including Ms. Mazzocco, have acted as alleged herein as the agents of USC, all defendants are collectively referred to hereafter as "Defendants".

## FACTS APPLICABLE TO ALL COUNTS

### I.     The Plans' investment structure

32.     Defendants select investment options into which participants' investments are directed, including those investment options that are removed from the Plans. These investments are designated by USC as available investment alternatives under the Plans.

33.     Prior to March 2016, Defendants selected and retained over *340* investment options, which included mutual funds, insurance pooled separate accounts, and insurance company fixed and variable annuity products. The mutual fund options included *retail* share class mutual funds, despite the massive size of the Plans. These retail share class mutual funds are designed for small individual investors and are identical in every respect to the institutional share class funds, except for much higher fees.

34.     The Plans' investments options were offered by four separate recordkeepers to the Plans. These recordkeepers included: Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), the Vanguard Group, Inc. ("Vanguard"), Fidelity Investments Institutional Operations Company ("Fidelity"), and Prudential Trust Company and Prudential Insurance Company of America (collectively, "Prudential"). With the exception of approximately fourteen investment options, all investments were proprietary investments of these four recordkeepers.

35.     Among the available investments in the Plans as of December 31, 2014, 32 were TIAA-CREF options holding $2.4 billion in Plan assets, 87 were Vanguard options holding $685 million in Plan assets, 190 were Fidelity options holding $1.2 billion in Plan assets, and 35 were Prudential options holding $117

**COMPLAINT**

million in Plan assets.[2]

36.    The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

37.    The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

38.    The Plans' CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

39.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a.  "administrative expense" charge (24 bps);[3]

_____

[2] The Plans also hold assets in SunAmerica investment products. However, effective July 2007, new contributions were frozen to these investments.
[3] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated

- 8 -

**COMPLAINT**

b. "distribution expense" charge (9.5 bps);

c. "mortality and expense risk" charge (0.5 bps); and

d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

40.    The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

a. "administrative expense" charge (26.5 bps);

b. "distribution expense" charge (8 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee "(18 bps); and

e.  "investment management expense" charge (36.5 bps).

41.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

42.    The Vanguard and Fidelity investment options offered to the Plans' participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

43.    The Prudential investment options in the Plans included both variable annuities, pooled separate accounts, and mutual funds.

//

as of May 1, 2014.

**COMPLAINT**

44.     Mutual funds have shareholders who are not participants in the Plans, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in the mutual funds, including participants in the Plan, pay the expenses set forth in ¶¶41–42.

45.     In March 2016, Defendants made certain changes to the Plans. They removed Prudential as one of the Plans' recordkeepers for future contributions, eliminated hundreds of mutual funds, removed certain fixed and variable annuity investment options, and froze contributions to certain other fixed and variable annuity investment options. The changes made by Defendants in March 2016 resulted in participants now being offered a total of approximately 34 investment options across the Plans' three remaining recordkeepers.[4]

46.     Despite these changes, and as set forth in further detail below, Defendants continue to include high-priced investment options in the Plans, retain three recordkeepers, and continue to allow excessive recordkeeping fees to be charged to the Plans.

**II.     Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

47.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans, like the Plans. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

48.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for

---

[4] The Plans' target date funds are counted as a single investment option.

**COMPLAINT**

competitive bidding at regular intervals of approximately three years.

49.     The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with an average account balance of $100,000 is the same as the cost of recordkeeping for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees for each plan participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

50.     Jumbo defined contribution plans, like the Plans, experience economies of scale for recordkeeping and administrative services. As the number of participants in a plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a large number of participants.

51.     Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, if prudent fiduciaries use revenue sharing (or asset-based charges) to pay for recordkeeping, they must monitor the total amount of compensation received by the recordkeeper to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue it receives that exceeds a reasonable recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can quickly result in excessive compensation to the recordkeeper. Funds that revenue share may use these payments as kickbacks

- 11 -

to induce recordkeepers to use higher-cost share classes as plan investment options.

52.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

53.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[5]

54.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

**1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

**2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[6]

55.     The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a

---

[5] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.
[6] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

**COMPLAINT**

more manageable number of institutional-quality investment
options to choose from. Participants will also benefit from
customized and consistent enrollment, education and ongoing
communication materials.[7]

56.    In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion
Annually, and What Can Be Done to Fix It", AonHewitt, an independent
investment consultant, similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne
costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an
"open architecture" investment menu, and packaging the
options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and
reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate
competitive pricing.

AonHewitt, *How 403(b) Plans are Wasting Nearly $10 Billion Annually, and What
Can Be Done to Fix It* (Jan. 2016).[8]

57.    Another independent investment consultant, Towers Watson, also
recognized that using multiple recordkeepers has caused:

high investment and administrative costs, and complex choices
for plan participants in terms of the number of vendors and the
array of investment options. Additionally, this complexity has
made it difficult for employers to monitor available choices and

---

[7] *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2.
[8] Available at
https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-
1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_
Whitepaper_FINAL.pdf.aspx.

**COMPLAINT**

provide ongoing oversight . . . . Such designs typically are
expensive and fail to leverage plan size. They can also be
confusing to the average plan participant, who is likely to fall
short of achieving retirement readiness and would benefit from
more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[9]

58.     Others in the industry make the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[10] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[11]

59.     Use of a single recordkeeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a

---

[9] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[10] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[11] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

**COMPLAINT**

result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[12]

60.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continue to contract with *three* recordkeepers (TIAA-CREF, Fidelity, and Vanguard). Prior to March 2016, Defendants also contracted with Prudential, for a total of *four* recordkeepers for the Plans. The inefficient and costly structure maintained by Defendants has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for recordkeeping and administrative services. There is no loyal or prudent reason for Defendants' failure to engage in a process to reduce duplicative services and the fees charged to the Plans long before March 2016, and before 2009, or to continue with three recordkeepers to date.

61.     The Plans' *four* recordkeepers prior to March 2016 received compensation for providing such services through per-participant fees and revenue sharing payments from the Plans' investments.

62.     Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments are:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

---

[12] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

- 15 -

**COMPLAINT**

63.     Fidelity and Vanguard are compensated for recordkeeping services based on internal revenue sharing they receive from their proprietary Fidelity or Vanguard mutual funds and/or direct payments from the Plans. Similarly, Prudential was and is compensated based on revenue sharing payments from its proprietary investment options that remain in the Plans.

64.     In addition, the Plans' recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

65.     Based on information currently available to Plaintiffs regarding the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the Plans' participant level (roughly 58,000 combined participant accounts), and the recordkeeping market, a reasonable recordkeeping fee for the Plans would have been a fixed amount of approximately $1,740,000 (or approximately $30 per participant with an account balance).

66.     Based on the direct and indirect compensation levels shown on the Plans' Form 5500s filed with the Department of Labor, and according to the internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options, each Plan paid up to $130 per participant per year from 2010 to 2014, which is well over 300% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

67.     This is a *very* conservative total because this amount excludes asset-based revenue sharing payments Prudential received for recordkeeping and administrative services from their proprietary variable annuities and mutual fund products. This information was not disclosed to Plan participants.

68.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end

of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[13]

69. Defendants also failed to control recordkeeping costs as Plan assets grew. From December 31, 2009 to December 31, 2014, the Plans' assets increased from $2.7 billion to over $4.6 billion, an increase of *70%.* Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendants could have capped the amount of revenue sharing to ensure that *all* excessive amounts above a reasonable recordkeeping fee were returned to the Plans as other, loyally and prudently administered plans do, but failed to do so.

70. Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. A competitive bidding process for the Plans' recordkeeping services would have produced a reasonable recordkeeping fee for the Plans. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

71. Defendants failed to prudently monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' recordkeepers. Had Defendants monitored the compensation paid to the Plans' recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $22 million of their retirement savings in the last six years alone.[14]

---

[13] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.
[14] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

**COMPLAINT**

III.   **Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.**

72.   Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[15] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

73.   To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

74.   If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing*

---

[15] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

**COMPLAINT**

mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

75.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

76.     Moreover, jumbo retirement plans have enormous bargaining power to obtain low fees for investment management services:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class-ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[16]

77.     Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the

---

[16] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

**COMPLAINT**

most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

78.     Lower-cost institutional share classes of mutual funds, compared to retail shares, are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plans. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees.

79.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that for a retirement plan of the Plans' size, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

80.     Despite these far lower-cost options, Defendants selected and continue to provide Plan investment options with far higher costs than were and are available for the Plans based on their size. Moreover, for the *exact same mutual fund option*, the Defendants selected and continue to offer much higher-cost share classes of identical mutual funds than were available to the Plans. The following table lists the significantly lower-cost share classes that were available to the Plans since 2010 but were not used:

//

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced K (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth K (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation K (FCAKX) | 68 bps | 26.47% |
| Fidelity China Region  (FHKCX) | 101 bps | Fidelity China Region I (FHKIX) | 98 bps | 3.06% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond Instl (FCNVX) | 30 bps | 33.33% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund K (FCNKX) | 78 bps | 16.67% |
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity K (FDEKX) | 51 bps | 33.33% |
| Fidelity Diversified International (FDIVX) | 96 bps | Fidelity Diversified International K (FDIKX) | 77 bps | 24.68% |
| Fidelity Dividend Growth (FDGFX) | 92 bps | Fidelity Dividend Growth K (FDGKX) | 71 bps | 29.58% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 137 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) I (FIEMX) | 126 bps | 8.73% |
| Fidelity Emerging Markets (FEMKX) | 109 bps | Fidelity Emerging Markets K (FKEMX) | 84 bps | 29.76% |

- 21 -

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II K (FETKX) | 54 bps | 27.78% |
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income K (FEIKX) | 54 bps | 37.04% |
| Fidelity Export & Multinational (FEXPX) | 84 bps | Fidelity Export & Multinational K (FEXKX) | 64 bps | 31.25% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom 2000 K (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom 2005 K (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom 2010 K (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom 2015 K (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom 2020 K (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom 2025 K (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom 2030 K (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom 2035 K (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom 2040 K (FFKFX) | 62 bps | 30.65% |
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom 2045 K (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050 (FFFHX) | 84 bps | Fidelity Freedom 2050 K (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom Income (FFFAX) | 50 bps | Fidelity Freedom Income K (FFKAX) | 42 bps | 19.05% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund K (FFDKX) | 43 bps | 39.53% |
| Fidelity Global Commodity Stock (FFGCX) | 111 bps | Fidelity Global Commodity Stock I (FFGIX) | 106 bps | 4.72% |
| Fidelity Growth & Income (FGRIX) | 74 bps | Fidelity Growth & Income K (FGIKX) | 53 bps | 39.62% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company K (FGCKX) | 72 bps | 23.61% |
| Fidelity Growth Discovery (FDSVX) | 75 bps | Fidelity Growth Discovery K (FGDKX) | 52 bps | 44.23% |
| Fidelity Growth Strategies (FDEGX) | 77 bps | Fidelity Growth Strategies K (FAGKX) | 51 bps | 50.98% |
| Fidelity Independence (FDFFX) | 92 bps | Fidelity Independence K (FDFKX) | 77 bps | 19.48% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery K (FIDKX) | 79 bps | 26.58% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth Z (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 113 bps | Fidelity International Real Estate I (FIRIX) | 112 bps | 0.89% |
| Fidelity International Small Cap (FISMX) | 120 bps | Fidelity International Small Cap I (FIXIX) | 108 bps | 11.11% |
| Fidelity Japan (FJPNX) | 90 bps | Fidelity Japan I (FJPIX) | 89 bps | 1.12% |
| Fidelity Large Cap Growth (FSLGX) | 90 bps | Fidelity Large Cap Growth I (FLNOX) | 82 bps | 9.76% |

- 23 -

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Latin America  (FLATX) | 107 bps | Fidelity Latin America I (FLFIX) | 104 bps | 2.88% |
| Fidelity Leveraged Company Stock (FLVCX) | 88 bps | Fidelity Leveraged Company Stock K (FLCKX) | 69 bps | 27.54% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock K (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan K (FMGKX) | 58 bps | 27.59% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock Z (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 79 bps | Fidelity Mid Cap Growth I (FGCOX) | 67 bps | 17.91% |
| Fidelity Mid-Cap Stock (FMCSX) | 64 bps | Fidelity Mid-Cap Stock K (FKMCX) | 41 bps | 56.10% |
| Fidelity OTC (FOCPX) | 104 bps | Fidelity OTC K (FOCKX) | 88 bps | 18.18% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas K (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan K (FPUKX) | 47 bps | 29.79% |
| Fidelity Real Estate Income (FRIFX) | 83 bps | Fidelity Real Estate Income I (FRIRX) | 79 bps | 5.06% |
| Fidelity Select Gold (FSAGX) | 91 bps | Fidelity Select Gold I (FGDIX) | 84 bps | 8.33% |
| Fidelity Select Materials (FSDPX) | 82 bps | Fidelity Select Materials I (FMFEX) | 81 bps | 1.23% |
| Fidelity Small Cap Independence (FDSCX ) | 85 bps | Fidelity Small Cap Independence I (FCDIX) | 85 bps | 0.00% |
| Fidelity Spartan 500 Index Instl (FXSIX) | 4 bps | Fidelity Spartan 500 Index Instl Prem (FXAIX) | 2 bps | 100.00% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan Emerging Markets Index Adv (FPMAX) | 20 bps | Fidelity Spartan Emerging Markets Index Instl Prem (FPADX) | 10 bps | 100.00% |
| Fidelity Spartan Extended Market Index Adv (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index Instl Prem (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Global ex-US Index Adv (FSGDX) | 18 bps | Fidelity Spartan Global ex-US Index Instl Prem (FSGGX) | 10 bps | 80.00% |
| Fidelity Spartan Inflation-Protected Index Adv (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index Instl Prem (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index Adv (FSIVX) | 7 bps | Fidelity Spartan International Index Instl Prem (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan International Index Instl (FSPNX) | 7 bps | Fidelity Spartan International Index Instl Prem (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan Mid Cap Index Adv (FSCKX) | 8 bps | Fidelity Spartan Mid Cap Index Instl Prem (FSMDX) | 4 bps | 100.00% |
| Fidelity Spartan Real Estate Index Adv (FSRVX) | 9 bps | Fidelity Spartan Real Estate Index Instl (FSRNX) | 7 bps | 28.57% |
| Fidelity Spartan Small Cap Index Adv (FSSVX) | 9 bps | Fidelity Spartan Small Cap Index Instl Prem (FSSNX) | 5 bps | 80.00% |
| Fidelity Spartan Total Market Index Adv (FSTVX) | 7 bps | Fidelity Spartan Total Market Index Instl Prem (FSKAX) | 5 bps | 40.00% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan US Bond Index Instl (FXSTX) | 7 bps | Fidelity Spartan US Bond Index Instl Prem (FXNAX) | 5 bps | 40.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector K (FSSKX) | 66 bps | 30.30% |
| Fidelity Stock Selector Small Cap (FDSCX) | 72 bps | Fidelity Stock Selector Small Cap I (FCDIX) | 70 bps | 2.86% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value K (FVLKX) | 46 bps | 36.96% |
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery K (FVDKX) | 74 bps | 28.38% |
| Fidelity Value Strategies (FSLSX) | 80 bps | Fidelity Value Strategies K (FVSKX) | 56 bps | 42.86% |
| Prudential Amer:Europacific Growth R3 (RERCX) | 114 bps | Prudential Amer:Europacific Growth R6 (RERGX) | 49 bps | 132.65% |
| Prudential American Funds American Balanced R3 (RLBCX) | 94 bps | Prudential American Funds American Balanced R6 (RLBGX) | 29 bps | 224.14% |
| Prudential Columbia Seligman Communication & Income A (SLMCX) | 136 bps | Prudential Columbia Seligman Communication & Income I (CSFIX) | 97 bps | 40.21% |
| Prudential DWS Small Cap Value A (KDSAX) | 122 bps | Prudential DWS Small Cap Value Instl (KDSIX) | 82 bps | 48.78% |
| Prudential Global Real Estate Z (PURZX) | 96 bps | Prudential Global Real Estate Q (PGRQX) | 83 bps | 15.66% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential Global Total Return Z (PZTRX) | 98 bps | Prudential Global Total Return Q (PGTQX) | 87 bps | 12.64% |
| Prudential Goldman Sachs Mid Cap Value A (GCMAX) | 114 bps | Prudential Goldman Sachs Mid Cap Value Instl (GSMCX) | 74 bps | 54.05% |
| Prudential American Funds Growth Fund of America R3 (RGACX) | 98 bps | Prudential American Funds Growth Fund of America R6 (RGAGX) | 30 bps | 226.67% |
| Prudential INVESCO Small Cap Growth A (GTSAX) | 121 bps | Prudential INVESCO Small Cap Growth R6 (GTSFX) | 73 bps | 65.75% |
| Prudential Jennison Mid Cap Growth Z (PEGZX) | 77 bps | Prudential Jennison Mid Cap Growth Q (PJGQX) | 58 bps | 32.76% |
| Prudential Jennison Nat Resources Z (PNRZX) | 87 bps | Prudential Jennison Nat Resources Q (PJNQX) | 74 bps | 17.57% |
| Prudential Jennison Value Z (PEIZX) | 79 bps | Prudential Jennison Value Q (PJVQX) | 63 bps | 25.40% |
| Prudential Legg Mason ClearBridge Small Cap Growth A (SASMX) | 124 bps | Prudential Legg Mason ClearBridge Small Cap Growth IS (LMOIX) | 78 bps | 58.97% |
| Prudential MFS Value A (MEIAX) | 92 bps | Prudential MFS Value R5 (MEIKX) | 53 bps | 73.58% |
| Prudential Oppenheimer Developing Markets A (ODMAX) | 130 bps | Prudential Oppenheimer Developing Markets I (ODVIX) | 85 bps | 52.94% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential Oppenheimer Global Allocation A (QVGIX) | 127 bps | Prudential Oppenheimer Global Allocation I (QGRIX) | 87 bps | 45.98% |
| Prudential PIMCO Total Return A (PTTAX) | 85 bps | Prudential PIMCO Total Return Instl (PTTRX) | 46 bps | 84.78% |
| Prudential Stock Index Z (PSIFX) | 25 bps | Prudential Stock Index I (PDSIX) | 19 bps | 31.58% |
| Vanguard 500 Index Inv (VFINX) | 17 bps | Vanguard 500 Index Instl Plus (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation Inv (VAAPX) | 29 bps | Vanguard Asset Allocation Adm (VAARX) | 21 bps | 38.10% |
| Vanguard Balanced Index Inv (VBINX) | 23 bps | Vanguard Balanced Index Instl (VBAIX) | 8 bps | 187.50% |
| Vanguard Capital Opportunity Inv (VHCOX) | 47 bps | Vanguard Capital Opportunity Adm (VHCAX) | 40 bps | 17.50% |
| Vanguard Developed Markets Index Inv (VDVIX) | 20 bps | Vanguard Developed Markets Index Instl (VTMNX) | 7 bps | 185.71% |
| Vanguard Developed Markets Index Inv (VDMIX) | 20 bps | Vanguard Developed Markets Index Instl Plus (VDMPX) | 6 bps | 233.33% |
| Vanguard Dividend Appreciation Index Inv (VDAIX) | 20 bps | Vanguard Dividend Appreciation Index Adm (VDADX) | 10 bps | 100.00% |
| Vanguard Emerging Markets Stock Index Inv (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index Instl Plus (VEMRX) | 10 bps | 230.00% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Energy Inv (VGENX) | 38 bps | Vanguard Energy Adm (VGELX) | 32 bps | 18.75% |
| Vanguard Equity-Income Inv (VEIPX) | 29 bps | Vanguard Equity-Income Adm (VEIRX) | 20 bps | 45.00% |
| Vanguard European Stock Index Inv (VEURX) | 26 bps | Vanguard European Stock Index Instl (VESIX) | 9 bps | 188.89% |
| Vanguard Explorer Inv (VEXPX) | 51 bps | Vanguard Explorer Adm (VEXRX) | 35 bps | 45.71% |
| Vanguard Extended Market Index Inv (VEXMX) | 23 bps | Vanguard Extended Market Index Instl (VIEIX) | 6 bps | 283.33% |
| Vanguard FTSE All-World ex-US Index Inv (VFWIX) | 29 bps | Vanguard FTSE All-World ex-US Index Instl Plus (VFWPX) | 10 bps | 190.00% |
| Vanguard FTSE All-World ex-US Small-Cap Index Inv (VFSVX) | 37 bps | Vanguard FTSE All-World ex-US Small-Cap Index Instl (VFSNX) | 18 bps | 105.56% |
| Vanguard FTSE Social Index Inv (VFTSX) | 27 bps | Vanguard FTSE Social Index Instl (VFTNX) | 16 bps | 68.75% |
| Vanguard GNMA Inv (VFIIX) | 21 bps | Vanguard GNMA Adm (VFIJX) | 11 bps | 90.91% |
| Vanguard Growth & Income Inv (VQNPX) | 37 bps | Vanguard Growth & Income Adm (VGIAX) | 26 bps | 42.31% |
| Vanguard Growth Index Inv (VIGRX) | 23 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | 187.50% |
| Vanguard Health Care Inv (VGHCX) | 35 bps | Vanguard Health Care Adm (VGHAX) | 30 bps | 16.67% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard High-Yield Corporate Inv (VWEHX) | 23 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | 76.92% |
| Vanguard Inflation-Protected Securities Inv (VIPSX) | 20 bps | Vanguard Inflation-Protected Securities Instl (VIPIX) | 7 bps | 185.71% |
| Vanguard Intermediate-Term Bond Index Inv (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index Instl Plus (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade Inv (VFICX) | 20 bps | Vanguard Intermediate-Term Investment-Grade Adm (VFIDX) | 10 bps | 100.00% |
| Vanguard Intermediate-Term Treasury Inv (VFITX) | 20 bps | Vanguard Intermediate-Term Treasury Adm (VFIUX) | 10 bps | 100.00% |
| Vanguard International Growth Inv (VWIGX) | 47 bps | Vanguard International Growth Adm (VWILX) | 34 bps | 38.24% |
| Vanguard Large-Cap Index Inv (VLACX) | 23 bps | Vanguard Large-Cap Index Instl (VLISX) | 8 bps | 187.50% |
| Vanguard Long-Term Bond Index Inv (VBLTX) | 20 bps | Vanguard Long-Term Bond Index Instl Plus (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade Inv (VWESX) | 22 bps | Vanguard Long-Term Investment-Grade Adm (VWETX) | 12 bps | 83.33% |
| Vanguard Long-Term Treasury Inv (VUSTX) | 20 bps | Vanguard Long-Term Treasury Adm (VUSUX) | 10 bps | 100.00% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Mid Cap Index Inv (VIMSX) | 23 bps | Vanguard Mid Cap Index Instl Plus (VMCPX) | 6 bps | 283.33% |
| Vanguard Mid-Cap Growth Index Inv (VMGIX) | 23 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX) | 9 bps | 155.56% |
| Vanguard Mid-Cap Value Index Inv (VMVIX) | 23 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 9 bps | 155.56% |
| Vanguard Morgan Growth Inv (VMRGX) | 40 bps | Vanguard Morgan Growth Adm (VMRAX) | 26 bps | 53.85% |
| Vanguard Pacific Stock Index Inv (VPACX) | 26 bps | Vanguard Pacific Stock Index Instl (VPKIX) | 9 bps | 188.89% |
| Vanguard Prime Money Market Inv (VMMXX) | 14 bps | Vanguard Prime Money Market Adm (VMRXX) | 10 bps | 40.00% |
| Vanguard PRIMECAP Inv (VPMCX) | 44 bps | Vanguard PRIMECAP Adm (VPMAX) | 35 bps | 25.71% |
| Vanguard REIT Index Inv (VGSIX) | 24 bps | Vanguard REIT Index Instl (VGSNX) | 8 bps | 200.00% |
| Vanguard Short-Term Bond Index Inv (VBISX) | 20 bps | Vanguard Short-Term Bond Index Instl (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal Inv (VSGBX) | 20 bps | Vanguard Short-Term Federal Adm (VSGDX) | 10 bps | 100.00% |
| Vanguard Short-Term Investment-Grade Inv (VFSTX) | 20 bps | Vanguard Short-Term Investment-Grade Instl (VFSIX) | 7 bps | 185.71% |
| Vanguard Short-Term Treasury Inv (VFISX) | 20 bps | Vanguard Short-Term Treasury Adm (VFIRX) | 10 bps | 100.00% |

- 31 -

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Growth Index Inv (VISGX) | 23 bps | Vanguard Small Cap Growth Index instl (VSGIX) | 8 bps | 187.50% |
| Vanguard Small Cap Index Inv (NAESX) | 23 bps | Vanguard Small Cap Index Instl Plus (VSCPX) | 6 bps | 283.33% |
| Vanguard Small Cap Value Index Inv (VISVX) | 23 bps | Vanguard Small Cap Value Index Instl (VSIIX) | 8 bps | 187.50% |
| Vanguard Total Bond Market Index Inv (VBMFX) | 20 bps | Vanguard Total Bond Market Index Instl (VBMPX) | 5 bps | 300.00% |
| Vanguard Total International Stock Index Inv (VGTSX) | 22 bps | Vanguard Total International Stock Index Instl Plus (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index Inv (VTSMX) | 17 bps | Vanguard Total Stock Market Index Instl Plus (VITPX) | 2 bps | 750.00% |
| Vanguard Total World Stock Index Inv (VTWSX) | 27 bps | Vanguard Total World Stock Index Instl Plus (VTWIX) | 15 bps | 80.00% |
| Vanguard U.S. Growth Inv (VWUSX) | 44 bps | Vanguard U.S. Growth Adm (VWUAX) | 30 bps | 46.67% |
| Vanguard Value Index Inv (VIVAX) | 23 bps | Vanguard Value Index Instl (VIVIX) | 8 bps | 187.50% |
| Vanguard Wellesley Income Inv (VWINX) | 25 bps | Vanguard Wellesley Income Adm (VWIAX) | 18 bps | 38.89% |
| Vanguard Wellington Inv (VWELX) | 26 bps | Vanguard Wellington Adm (VWENX) | 18 bps | 44.44% |

**COMPLAINT**

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Windsor II Inv (VWNFX) | 36 bps | Vanguard Windsor II Adm (VWNAX) | 28 bps | 28.57% |
| Vanguard Windsor Inv (VWNDX) | 38 bps | Vanguard Windsor Adm (VWNEX) | 28 bps | 35.71% |

81.     These lower-cost share classes of the identical mutual funds for the Plans have been available for years, some dating back over a decade or before.

82.     The failure to select far lower-cost share classes for the Plans' mutual fund options that are otherwise *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

83.     Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the available lower-cost share class mutual fund options, the Plans' participants would not have lost millions of dollars of their retirement savings.

**IV.     Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.**

84.     Defendants provided a litany of duplicative funds in the same investment style, thereby depriving the Plans of their bargaining power associated with offering a single fund in each investment style that significantly reduces investment fees, and leading to "decision paralysis" for participants. Prior to March 2016, Defendants placed over 340 investments in the investment lineup for the

- 33 -

**COMPLAINT**

following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, real estate, fixed income, and money market.

85.     In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[17] This provides choice of investment style to participants while maintaining a large pool of assets in each investment style and avoiding confusion.

86.     A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

87.     Prudent fiduciaries of large defined contribution plans must engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

88.     Within each asset class and investment style in the plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. Unlike the Defendant, prudent fiduciaries do not select and retain numerous, duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to obtain much lower investment management expenses for that style.

[17] Available at https://www.callan.com/research/files/990.pdf.

**COMPLAINT**

89.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup, and leads to decision paralysis. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009)("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[18]

90.     Moreover, having many actively managed funds in the Plan within the same investment style results in the Plans effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

91.     Defendants provided duplicative investments in every major asset class and investment style, including balanced/asset allocation (at least 24 options), fixed income and high yield bond (at least 52 options), international (at least 55 options), mid cap domestic equities (at least 31 options), small cap domestic equities (at least 18 options), real estate (at least 7 options), money market (at least 12 options), sector/specialty funds (at least 48 options), and target date investments (3 fund families). Such an overwhelming array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants and can lead to decision paralysis.

92.     For illustration purposes, the Plans' approximately 16 large cap domestic blend investments as of December 31, 2014 are summarized below and

---

[18] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

**COMPLAINT**

compared to a single lower-cost alternative available to the Plans: the Vanguard Institutional Index Fund (Instl. Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps. The DC Plan's assets are noted in this example.

| Large Cap Blend Investment | Assets | Fee | Institutional Index Fund (VIIIX) | Plans' Excess Cost |
|---|---|---|---|---|
| CREF Equity Index Account | $45,696,150 | 37 bps | 2 bps | 1750% |
| CREF Stock Account | $242,459,930 | 46 bps | 2 bps | 2200% |
| Fidelity Disciplined Equity (K) (FDEKX) | $1,463,260 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income (K) (FGIKX) | $10,197,038 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index (FLCEX) | $209,186 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock (FLCSX) | $908,109 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock (FGRTX) | $1,536,892 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index (Instl) (FXSIX) | $18,588,698 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index (Instl) (FSKTX) | $5,797,878 | 5 bps | 2 bps | 150% |
| Prudential Stock Index (Z) (PSIFX) | $2,870,553 | 25 bps | 2 bps | 1150% |
| Vanguard 500 Index (Inv) (VFINX) | $16,886,278 | 17 bps | 2 bps | 750% |
| Vanguard Growth & Income (Inv) (VQNPX) | $1,454,767 | 37 bps | 2 bps | 1750% |

**COMPLAINT**

| Large Cap Blend Investment | Assets | Fee | Institutional Index Fund (VIIIX) | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Large-Cap Index (Inv) (VLACX) | $349,936 | 23 bps | 2 bps | 1050% |
| Vanguard PRIMECAP Core (Inv) (VPCCX) | $1,881,908 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | $13,474,198 | 17 bps | 2 bps | 750% |
| **DC Plan Total Assets** | $363,809,716 | | | |

93.   With over *$640 million* in combined Plan assets held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively.



//

//

- 37 -

**COMPLAINT**

94.     Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. If those investments were consolidated into a single investment for the large cap domestic blend asset category, such as the Vanguard Institutional Index Fund (Inst Plus), the Plans would have saved millions of dollars in investment management expenses for 2014 alone, and many more millions since 2010.

95.     In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to hold and generate investment returns in excess of its benchmark, passively managed index funds hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

96.     For example, in the large cap blend investment style, Defendants provided at least *seven* index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

97.     Since index funds merely hold the same securities in the same proportions as the index, having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the size of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

//

//

- 38 -

**COMPLAINT**

98.     Had Defendants combined Plan assets of duplicative index funds into a single index fund, the Plans would have generated higher returns, net of fees, and participants would not have lost significant retirement assets.

99.     Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, as set forth in ¶91, which caused the Plans' participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

**V.     Defendants have admitted that the Plans' prior structure was imprudent and caused unreasonable fees to be charged to the Plans.**

100.   Defendants expressly acknowledged that the Plans' multiple recordkeeper structure and *hundreds* of investment options caused the Plans to pay unreasonable recordkeeping and investment fees. In a January 27, 2016 Plan communication notifying participants of the March 2016 changes, Defendants stated:

> These changes are designed to **simplify your investment choices** for retirement savings, encourage better decision making **and lower costs**. Highlights of the changes include a fund menu with a suite of target date retirement funds and 34 **best-in-class funds** available through three investment providers (Fidelity, TIAA-CREF and Vanguard), **lower cost share classes whenever possible**, and a self-directed brokerage window.[19]

101.   In the Transition Guide, Defendants further recognized the benefits of the consolidated investment lineup.

> A new streamlined investment lineup

---

[19] Michael W. Quick to USC Retirement Plan Participants, *USC Retirement Plan Changes,* Jan. 27, 2016 (emphasis added), available at https://benefits.usc.edu/files/2015/12/Signed-Plan-Changes-Announcement-Letter.pdf.

**COMPLAINT**

- 1 suite of target date retirement funds.
- 34 mutual funds and annuity contracts.
- **Lower administrative costs.**
- **Lower-cost share classes whenever possible.[20]**

102. Debra Fabanish, the Director of USC's Retirement Plan Administration, described the changes made to the Plans and directly admitted that the prior Plan structure led to higher fees and decision paralysis by Plan participants.

**What?**

Effective March 1, the University will implement a set of changes to the USC retirement plans designed to:

- **Simplify your investment choices for retirement**.
- Encourage better decision making.
- **Lower expenses**.

**Why?**

Many participants opt out of active decision making:

- **Overwhelmed by over 350 current fund choices**.
- Default rate amount <u>newly eligible</u> employees is almost 50%.
- Current default provider is designed for a more engaged participant.[21]

103. Moreover, Ms. Fabanish specifically noted the Committee's "Guiding Principles & Goals" in support of the Plan changes, which included meeting their "fiduciary obligations" and lowering investment expenses by "leveraging" Plan assets. In their entirety, these principles included:

---

[20] University of Southern California, *USC Retirement Plans Transition Guide*, at 2–3 available at https://benefits.usc.edu/files/2015/12/USC-Transition-Guide.pdf.
[21] University of Southern California, *Changes to USC Retirement Plans 2016 Webcast* (Feb. 2016)(bold emphasis added), available at https://benefits.usc.edu/retirement/retirement-plan/your-investments/.

**COMPLAINT**

**Guiding Principles & Goals**

- **Simplify the participant experience in selecting investments**.
- **Meet fiduciary obligations**.
- **Leverage the assets in the USC plans to obtain lower cost investment options.**
- Maintain existing relationships with investment providers (Fidelity, TIAA-CREF and Vanguard).
- **Offer the choice of low cost investment options.**
- **Offer the choice of best-in-class investment options**.
- Provide a self-directed brokerage account for sophisticated participants who want more investment options.
- Minimize unnecessary disruption.[22]

104.    Had Defendants conducted a prudent and loyal analysis of the Plans' investments and service providers many years before 2016, or at least by 2009, Plan participants would have avoided paying millions of dollars in unreasonable investment and administrative fees, and millions of dollars in performance losses.

**VI.    Defendants imprudently and disloyally retained historically underperforming Plan investments.**

105.    Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

//

//

//

_____

[22] *Changes to USC Retirement Plans 2016 Webcast* (emphasis added).

**COMPLAINT**

### A.     CREF Stock Account

106.    The CREF Stock Account is one of the largest, by asset size, investment options in the Plans with over $550 million in assets. The CREF Stock Account is the largest large cap blend investment option in the Plans and has been included in the Plans from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

107.    TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

108.    As is generally understood in the investment community, passively managed investment options should be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and extremely unlikely to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in ¶¶72–74. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike

smaller stocks that are not covered by many analysts leading to potential inefficiencies in pricing.

109.   The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[23]

110.   Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks . . . . The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]. . . . The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.

> ***

---

[23] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

**COMPLAINT**

Most of the dismal comparisons for active managers are for

large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *Chapter 3: The Active Versus Passive Debate: Perspectives of an*

*Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J.

Fabozzi ed., 1998).

111.  Prudent fiduciaries of large defined contribution plans must conduct an

analysis to determine whether large cap actively managed funds will outperform

their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to

whether it would be in the participants' best interest to offer an actively managed

large cap option for the particular investment style and asset class.

112.  Defendants failed to undertake such analysis when they selected and

retained the actively managed CREF Stock Account. Defendants also provided the

fund option without conducting a prudent analysis despite the acceptance within the

investment industry that the large cap domestic equity market is the most efficient

market, and active managers do not outperform passive managers net of fees in this

investment style.

113.  Had such an analysis been conducted by Defendants, they would have

determined that the CREF Stock Account would not be expected to outperform the

large cap index after fees. That is in fact what occurred.

114.  Rather than poor performance in a single year or two, historical

performance of the CREF Stock Account has been persistently poor for many years

compared to both available lower-cost index funds and the index benchmark. Upon

information and belief, in participant communications, Defendants and TIAA-

CREF identified the Russell 3000 index as the appropriate benchmark to evaluate

the fund's investment results. The following performance chart compares the

investment returns of the CREF Stock Account to its benchmark and two other

passively managed index funds in the same investment style for the one-, five-, and

**COMPLAINT**

ten-year periods ending December 31, 2014.[24] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



115.   The CREF Stock Account with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

---

[24] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500 with the Department of Labor.

**COMPLAINT**

116.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap blend alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), Vanguard PRIMECAP (Adm) (VPMAX), and Vanguard Capital Opp. (Adm) (VHCAX).



117.   The CREF Stock Account also had a long history of substantial underperformance compared to actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[25]

---

[25] Because the Vanguard Diversified Equity Fund's inception date was June 10,

**COMPLAINT**





2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.

**COMPLAINT**





**CREF Stock Account**
**Ten-Year Investment Returns Compared to**
**Actively Managed Benchmarks**
(as of Dec. 31, 2009)

118.    Despite the consistent underperformance, the CREF Stock Account with an expense ratio of 46 bps as of December 31, 2014 was more expensive than better performing actively managed alternatives: Vanguard Diversified Equity (Inv) (40 bps), Vanguard PRIMECAP (Adm) (35 bps), and Vanguard Capital Opp. (Adm) (40 bps).

119.    Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, InBRIEF, at 3 (July 2012).[26] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio

---

[26] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

- 48 -

**COMPLAINT**

managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

120.   The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite underperforming lower-cost investment alternatives that were readily available to the Plans.

121.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options.

122.   Defendants' imprudent and disloyal inclusion and retention of the CREF Stock Account caused the Plans to lose over $130 million compared to what the Plans would have earned had the same amount of assets been invested in certain of the lower-cost prudent alternatives, as set forth in ¶¶114–116.[27]

### B.   TIAA Real Estate Account

123.   Defendants selected and continue to offer the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

//

---

[27] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

**COMPLAINT**

124.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.



125.   The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[28] Despite this, Defendants selected and to date retain it in the Plan.

//

//

//

//

_____

[28] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.

- 50 -

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27
28



**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**TIAA Real Estate Account**
**Ten-Year Investment Returns Compared to**
**REIT Index Fund (VGSNX)**
**(as of Dec. 31, 2009)**

239%
greater than
TIAA
return

12%
10%
8%
6%
4%
2%

**10 Year**

■ TIAA Real Estate Account   ■ VGSNX

15   126.   This underperformance occurred for years before 2009 and has

16   continued afterward. The TIAA Real Estate Account vastly underperformed the

17   Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending

18   December 31, 2014.[29]

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28   [29] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500 with the Department of Labor.

- 52 -

**COMPLAINT**





127.   As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

128.   Defendants' imprudent and disloyal inclusion and retention of the TIAA Real Estate Account caused the Plans to lose millions of dollars compared to what the Plans would have earned had the same amount of assets been invested in

**COMPLAINT**

the Vanguard REIT Index.[30]

## ERISA'S FIDUCIARY STANDARDS

129.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan
solely in the interest of the participants and beneficiaries and –

(A)    for the exclusive purpose of:

(i) providing benefits to participants and their
beneficiaries; and

(ii) defraying reasonable expenses of administering the
plan; [and]

(B)    with the care, skill, prudence, and diligence under the
circumstances then prevailing that a prudent man acting in
a like capacity and familiar with such matters would use
in the conduct of an enterprise of like character and with
like aims.

130.   Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any
employer and shall be held for the exclusive purposes of
providing benefits to participants in the plan and their
beneficiaries and defraying reasonable expenses of
administering the plan.

//

---

[30] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Inst) to compensate participants who have not been reimbursed for their losses.

- 54 -

**COMPLAINT**

131.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

132.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

133.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who

**COMPLAINT**

breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

134.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

135.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

All participants and beneficiaries of the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan from August 17, 2010, through the date of judgment, excluding the Defendants or any participant who is a fiduciary to the Plans.

136.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The Class includes over 28,000 members and is so large that joinder of all its members is impracticable.

- 56 -

**COMPLAINT**

b.      There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to

- 57 -

**COMPLAINT**

protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

137.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

138.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

   a.   Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field". *Abbott v. Lockheed Martin Corp*., No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc*., No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp*.,

**COMPLAINT**

No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable Defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

   b. The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plan.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D. Ill. Nov. 22, 2010).

   c. Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

- 59 -

**COMPLAINT**

district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

   d.   Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015), in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

   e.   The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k)*

**COMPLAINT**

*Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[31]

Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29,

2014);[32] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J.

(Feb. 23, 2015);[33] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,

N.Y. TIMES (Oct. 16, 2014);[34] Sara Randazzo, *Plaintiffs' Lawyer Takes on*

*Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[35] Jess Bravin and Liz Moyer,

*High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST.

J. (May 18, 2015); [36] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans*

*on Trial*, NPR (Dec. 15, 2014);[37] Mark Miller, *Are 401(k) Fees Too High?*

*The High Court May Have an Opinion*, REUTERS (May 1, 2014);[38] Greg

Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*,

BLOOMBERG (Oct. 2, 2014).[39]

## COUNT I

**Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees**

139.   Plaintiffs restate and incorporate the allegations in the preceding

paragraphs.

*//*

---

[31] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[32] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[33] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[34] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[35] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[36] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[37] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[38] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[39] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

**COMPLAINT**

140.   The scope of the fiduciary duties and responsibilities of the Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

141.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc*., 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plans' expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

142.   Defendants failed to engage in a prudent and loyal process for selecting and retaining a recordkeeper. Rather than consolidating the Plans' administrative and recordkeeping services under a single service provider, Defendants retained four and then three recordkeepers to provide recordkeeping and administrative services. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

143.   Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plans' recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plans. As the amount of assets grew, the revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

**COMPLAINT**

144.   Total Plan losses will be determined after complete discovery in this case and are continuing.

145.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

146.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

**Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses**

147.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

148.   The scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

//

//

**COMPLAINT**

149.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

150.   Defendants selected and retained as Plan investment options mutual funds and insurance company variable annuities with far higher expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

151.   Rather than consolidating the Plans' over 340 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower-cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion.  In addition, Defendants, as fiduciaries charged with operating as a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans, including lower-cost share class mutual funds with the identical investment manager and investments and lower-cost insurance company separate accounts. In so doing, Defendants failed to make investment decisions for the Plans based solely on the merits of the investment funds and what was in the interest of participants. Defendants, therefore, failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to

**COMPLAINT**

participants and their beneficiaries and defraying reasonable expenses of administering the Plans. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

152.   The same conduct by Defendants shows a failure to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants, therefore, breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

153.   Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

154.   CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed and actively managed investments with similar underlying asset allocations.

155.   TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

156.   Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

//

**COMPLAINT**

157.   Total Plan losses will be determined after complete discovery in this case and are continuing.

158.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

159.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Failure to Monitor Fiduciaries

160.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

161.   Upon information and belief, USC is the named fiduciary with the overall responsibility for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a).  USC is the Plan Administrator of the Plans under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

162.   Given that USC had the overall responsibility for the oversight of the Plans, USC had a fiduciary responsibility to monitor the performance of the other

- 66 -

**COMPLAINT**

fiduciaries, including those delegated fiduciary responsibility to administer and manage Plan assets.

163.   A monitoring fiduciary must ensure that its monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

164.   USC breached its fiduciary monitoring duties by, among other things:

a.     Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.     Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.     Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.     Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment

**COMPLAINT**

options that charged significantly lower fees and expenses than the Plans' mutual fund and insurance company variable annuity options; and

     e.    Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

165.  Had USC discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

**JURY TRIAL DEMANDED**

166.  Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated participants of the Plans and beneficiaries, respectfully request that the Court:

- Find and declare that the Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plans' losses under 29 U.S.C. §1109(a) should be calculated;

**COMPLAINT**

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);
- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;
- Reform the Plans to include only prudent investments;
- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;
- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;
- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

August 17, 2016                    Respectfully submitted,

s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON LLP
Jerome J. Schlichter
100 South Fourth Street; Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
Attorneys for Plaintiffs

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT**