UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Allen L. Munro et al., <br><br>    Plaintiffs, <br><br> v. <br><br> University of Southern California et al., <br><br>    Defendants. | CV 16-6191-VAP (CFEx) <br><br> **ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION (DOC. NO. 47)** |

On December 19, 2016, USC Retirement Plan Oversight Committee and Lisa Mazzocco ("Defendants") filed their Motion to Compel Arbitration and Dismiss for Improper Venue, or in the Alternative, to Stay Proceedings ("Motion").  (Doc. No. 47.)  On January 30, 2017, Allen Munro, Daniel C. Wheeler, Edward E. Vaynman, Jane A. Singleton, Sarah Gleason, Rebecca A. Snyder, Dion Dickman, Corey Clark, and Steven L. Olson ("Plaintiffs") filed their opposition.  (Doc. No. 48.)  Defendants filed their reply on February 21, 2017. (Doc. No. 49.)  After considering all papers filed in support of and in opposition to the Motion, as well as all oral argument made at the March 13, 2017 hearing, the Court DENIES the Motion.

## I.   BACKGROUND

Plaintiffs all work or have worked at the University of Southern California ("USC") in different capacities and all participate in either the University of Southern California Retirement Savings Program or the University of Southern California Tax-Deferred Annuity Plan (the "Plans").  (Doc. No. 40 ¶¶ 21–29.)

Defendant USC Retirement Plan Oversight Committee is the body responsible for administering and investing the plans' assets, and defendant Lisa Mazzocco is the current chairperson of the committee. (Id. ¶¶ 32-33.) Plaintiffs have sued Defendants for violating their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"). (Id. ¶¶ 1-5, 36-42.)

Defendants brought this Motion based on arbitration agreements that Plaintiffs were required to sign upon beginning their employment at USC. (Doc. No. 47 at 13-14; Doc. No. 48 at 10.) The arbitration agreements signed by Plaintiffs Munro, Wheeler, Gleason, Snyder, Singleton, Dickman, Clark, and Olson state, in pertinent part:

> the University and the faculty or staff member named below ("Employee") agree to the resolution by arbitration of all claims, whether or not arising out of Employee's University employment, remuneration or termination, that Employee may have against the University or any of its related entities, including but not limited to faculty practice plans, or its or their officers, trustees, administrators, employees or agents, in their capacity as such or otherwise; and all claims that the University may have against Employee. Any claim that otherwise would have been decidable in a court of law— whether under local, state or federal law—will instead be decided by arbitration, except as specifically excluded by this Agreement. The claims covered by this Agreement include, but are not limited to, . . . claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance. . . . The parties agree that final and

2

> binding arbitration shall be the sole and exclusive remedy for resolving any claims covered by this Agreement, instead of any court action, which is hereby expressly waived.

(Doc. Nos. 47-6, 47-7, 47-8, 47-9, 47-10, 47-12, 47-13, 47-14.)

The arbitration agreement signed by plaintiff Vaynman states, in pertinent part:

> The University and Edward Vaynman ("Employee") agree to the resolution by arbitration of all claims, not arising out of Employee's University employment, remuneration or termination, that Employee may have against the University, its officers, trustees, administrators, employees or agents, in their capacity as such or otherwise, and all claims that the University may have against Employee. The claims covered by this Agreement to Arbitrate Claims ("Agreement") include and are limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); claims for personal, physical, or emotional injury, or for any tort; claims for discrimination or harassment (including and [sic] limited to, race, sex, religion, national origin, age, marital status, sexual orientation, or medical condition or disability); claims for benefits; and claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance. The parties agree that final and binding arbitration shall be the sole, but not exclusive remedy for resolving any claims covered by this Agreement, including of any court action,

> which is hereby expressly allowed except that matters which are subject to review by writ of mandamus under California Code of Civil Procedure, Section 1094.5 shall be resolved exclusively under that procedure. . . . Employee understands and agrees that by signing this Agreement he/she and the University are not giving up their respective rights to a jury trial.

(Doc. No. 47-11.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") "was enacted . . . in response to widespread judicial hostility to arbitration agreements." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citation omitted). It governs arbitration agreements in contracts involving transactions in interstate commerce, including employment contracts. See 9 U.S.C. § 1; Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001).

Section 2 of the FAA states: "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 of the FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." Concepcion, 563 U.S. at 339 (citation and internal quotation marks omitted). "In line with these principles, courts must place

4

arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." Id. (citations omitted).

"Because the FAA mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed, the FAA limits courts' involvement to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." Cox v. Ocean View Hotel Corp., 533 F.3d 1114, 1119 (9th Cir. 2008) (citation and internal quotation marks omitted). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000).

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 91–92 (2000).

### III. DISCUSSION

As Plaintiffs are the parties opposing arbitration, they "bear the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp., 531 U.S. at 91–92.

#### A. Arbitrability of ERISA Claims

Plaintiffs argue ERISA claims are not arbitrable because "[o]ne of the purposes of Congress in enacting ERISA was to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" (Doc. No. 48 at 12.)

5

The Ninth Circuit, "in the past, expressed skepticism about the arbitrability of ERISA claims, see Amaro v. Cont'l Can Co., 724 F.2d 747, 750 (9th Cir. 1984), but those doubts seem to have been put to rest by the Supreme Court's opinions." Comer v. Micor, Inc., 436 F.3d 1098, 1100 (9th Cir. 2006). Recent case law from within the Ninth Circuit now holds that ERISA claims are subject to arbitration when the parties have executed a valid arbitration agreement. Jeld-Wen Master Welfare Ben. Plan v. Tri-City Health Care Dist., No. 12CV197-GPC RBB, 2012 WL 5944215, at *7 (S.D. Cal. Nov. 27, 2012) ("Courts have uniformly held that ERISA claims are arbitrable."); Fabian Fin. Servs. v. Kurt H. Volk, Inc. Profit Sharing Plan, 768 F. Supp. 728, 733–34 (C.D. Cal. 1991) ("Fabian has not carried its burden of showing, either by the text or legislative history of ERISA, or by analysis of ERISA's underlying purpose, that Congress intended to preclude a waiver of ERISA's judicial remedies"); Sanzone-Ortiz v. Aetna Health of Cal., Inc., No. 15-CV-03334-WHO, 2015 WL 9303993, at *5 (N.D. Cal. Dec. 22, 2015) (finding "that 29 U.S.C. § 1001(b) does not provide the requisite congressional command necessary to override the FAA," and a plaintiff's ERISA claims were arbitrable); Luchini v. Carmax, Inc., No. CV F 12-0417 LJO DLB, 2012 WL 2995483, at *6 (E.D. Cal. July 23, 2012) ("We hold that Congress did not intend to preclude a waiver of a judicial forum for statutory ERISA claims. We further hold that the FAA requires courts to enforce agreements to arbitrate such claims"); Shappell v. Sun Life Assur. Co., No. 2:10-CV-03020-MCE, 2011 WL 2070405, at *3 (E.D. Cal. May 23, 2011) ("In Comer v. Micor, Inc., 436 F.3d 1098, 1100–01 (9th Cir.2006), the Ninth Circuit went so far as to note that any skepticism about the arbitrability of ERISA claims has been put to rest by the Supreme Court's decisions in Shearson/American Express Inc. v. MacMahon, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) and

6

Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)."); see Hornsby v. Macon Cty. Greyhound Park, Inc., No. 3:10CV680-MHT, 2012 WL 2135470, at *5 (M.D. Ala. June 13, 2012) ("courts have analyzed the purpose of both ERISA and the FAA and have 'uniformly held that ERISA claims are arbitrable.'"). In view of this case law and the clear "liberal federal policy favoring arbitration," the Court holds Plaintiffs' ERISA claims are arbitrable. Concepcion, 131 S. Ct. at 1745.

### B. The Arbitration Agreements Do Not Control Plaintiffs' § 1132(a)(2) Claims Because the Retirement Plans Did Not Consent to Arbitrate

Civil actions to protect employee benefit plans are addressed in § 1132(a)(2),[1] which states "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." Id. Section 1109 states,

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary.

---

[1] 29 U.S.C. §§ 1132(a)(2) is often referred to in case law as ERISA § 502(a)(2). As § 1132(a)(2) is simply the codification of ERISA § 502(a)(2), the two are used interchangeably.

29 U.S.C.A. § 1109.

Even though Plaintiffs signed arbitration agreements, Plaintiffs argue they are not required to arbitrate their fiduciary duty claims under 29 U.S.C. §§ 1132(a)(2) and 1109 because claims under 29 U.S.C. §§ 1132(a)(2) and 1109 are brought on behalf of the Plans themselves, and Plaintiffs' arbitration agreements cannot bind the Plans. (Doc. No. 48 at 13–14.) While Defendants agree Plaintiffs' arbitration agreements cannot bind the Plans, Defendants argue the agreements still bind Plaintiffs, and thus since it is Plaintiffs who are bringing the claim on behalf of the Plans, Plaintiffs are required to arbitrate. (Doc. No. 49 at 12.)

Accordingly, the issue here is whether an arbitration agreement, signed by participants at the start of their employment, not signed by anyone with authority to bind an ERISA plan, and not part of the plan documents, can require participants who file suit on behalf of the plan under 29 U.S.C. §§ 1132(a)(2) and 1109 to submit those claims to arbitration.

The parties have not cited, and the Court has not found, any Ninth Circuit case law directly addressing this issue. The Ninth Circuit, however, has addressed a closely related issue: whether a release and covenant not to sue prevents a participant from suing on behalf of a plan under 29 U.S.C. §§ 1132(a)(2) and 1109. Bowles v. Reade, 198 F.3d 752, 760 (9th Cir. 1999). In Bowles, a retired participant sued her retirement plan's fiduciaries for breach of fiduciary duties to the plan, which the court later construed to be a claim under § 502(a)(2). Id. at 756, 760. The participant settled with one of the fiduciaries, and as part of the settlement, the participant signed a release. Id. at 756. The release stated the participant "for

herself and her respective attorneys, trustees, fiduciaries, administrators, conservators, guardians, representatives, heirs, successors and assigns, present and future, hereby fully and forever releases and discharges" the fiduciary, but the plan never signed the settlement or agreed to the release. Id. The participant and fiduciary then moved to dismiss the fiduciary with prejudice, pursuant to the settlement. Id. The court held the breach of fiduciary duty claims under § 502(a)(2) could not be dismissed without the plan's consent, and thus the court refused to dismiss these claims against the fiduciary. Id. at 759–60. Indeed, "[b]ecause [the participant's] claims [we]re not truly individual, it was proper for the district court to conclude that [the participant] could not settle them without The Plans' consent." Id. at 760.

In In re Schering Plough Corp. ERISA Litigation, 589 F.3d 585 (3d Cir. 2009), the Third Circuit reached the same conclusion. Id. at 593. In Schering, a participant signed a release contained in a separation agreement after leaving her former employer, stating, "I release the Company (which includes Schering–Plough, and all of its subsidiaries, affiliates, officers, directors, and employees) from all claims and liabilities which I have or may have against it as of the date on which I sign this Agreement." Id. at 592 n.4. The agreement continued, "I promise that I will not file a lawsuit against the Company in connection with any aspect of my employment or termination. I also waive the right to all remedies in any such action that may be brought on my behalf." Id. The participant then brought a § 502(a)(2) claim on behalf of her retirement plan against her employer, and the employer argued the release barred the claim. Id. at 595. The court held that even though the participant signed the release and the release was valid, "[§] 502(a)(2) claims are, by their nature, plan claims." Id. Thus, because the participant's claims were brought

9

under § 502(a)(2), they were "causes of action that belong[ed] to the Plan and [we]re based on duties owed to the Plan" and could not be affected by the participant's release.  Id.  The court stated, "[t]he vast majority of courts have concluded that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2)." Id.

Similarly, in Johnson v. Couturier, No. 2:05CV02046 RRB KJM, 2006 WL 2943160 (E.D. Cal. Oct. 13, 2006), a participant sued his employer for unpaid vacation time and wages and eventually settled. Id. at *1.  As a part of the settlement, the participant signed a release of all claims against his employer. Id.  The release stated the participant "on behalf of his heirs, agents, executors, successors, administrators, attorneys and assigns, and any and all persons claiming by or through him, does hereby release, quit and forever discharge [the employer], their respective predecessors, successors, assigns, parents, affiliated companies." Id.  The release included "any and [all] liabilities, damages, actions, causes of action, claims, demands or suits . . . including . . . any claims . . . or proceeding in federal, state, or local court . . . including claims under . . . the Employee Retirement Income Security Act of 1974." Id.  The participant then brought a claim under § 502(a)(2) on behalf of his retirement plan against the plan's fiduciaries, and the fiduciaries, who were included in the release, argued the release barred the claim.  Id. at *2.  The court agreed that the release barred "all individual claims [the participant] could assert against" the fiduciaries but held the release could not bar the participant's suit on behalf of the plan under § 502(a)(2). Id. The Court reasoned, "[w]hile [the participant] could waive his individual claims against the Individual Defendants, he could not waive the claims brought under § 502(a)(2) for the benefit of the [plan] without the consent of the [plan]." Id.  Accordingly, "[w]ithout the

consent of the Plan (or Plan administrator/fiduciary), [the participant] had no authority or power to release the § 502(a)(2) claims." Id.

In In re JDS Uniphase Corp. ERISA Litig., No. 03-04743 WWS, 2006 WL 2597995 (N.D. Cal. Sept. 11, 2006), participants signed release agreements with their employer upon receiving severance packages. Id. at *1. The releases stated the participants "completely release from and agree not to file, cause to be filed, or otherwise pursue against the company, its affiliated, related, parent or subsidiary corporations, and its present and former directors, officers, and employees any and all claims [the participants] may now have or have ever had against the [employer]." Id. The participants then brought claims under § 502(a)(2) on behalf of their retirement plan against the employer, who was a fiduciary of the plan. Id. The court held the releases did "not bar ERISA fiduciary duty claims brought by plan beneficiaries on behalf of the plan." Id. Thus, because the participants "allege[d] plan-wide fiduciary wrongdoing and s[ought] plan-wide relief[, the participants'] individual releases . . . d[id] not bar the [§ 502(a)(2)] claims." Id. at *2.

Numerous other courts have also held waivers signed by individual participants cannot bar claims made by the same participants on behalf of a retirement plan under § 502(a)(2). In re Polaroid ERISA Litig., 240 F.R.D. 65, 75 (S.D.N.Y. 2006) ("numerous courts have held that under ERISA, individuals do not have the authority to release a defined contribution plan's right to recover for breaches of fiduciary duty"); In re Williams Cos. ERISA Litig., 231 F.R.D. 416, 423 (N.D. Okla. 2005) ("First, the Court notes that the claims here are brought on behalf of the Plan, and a participant cannot release the Plan's claims, as a matter of law"); In re Aquila ERISA Litig., 237 F.R.D. 202, 210 (W.D. Mo. 2006) ("As

11

discussed throughout this Order, the instant claims in this action are brought on behalf of the Plan, pursuant to ERISA § 502(a)(2), not by ERISA plan participants seeking individual benefits. As a matter of law, a plan participant cannot release the Plan's claims")

The Court is persuaded the same rule applies to participants' agreements to arbitrate. Just as a participant suing on behalf of a plan under § 502(a)(2) cannot waive a plan's right to pursue claims, a participant cannot waive a plan's right to file its claims in court. In each of Bowles, Schering, Johnson, and JDS Uniphase, plan participants signed broad releases of their right to sue their plan's fiduciaries as part of either settlements or separation agreements. Even though the courts in Bowles, Schering, Johnson, and JDS Uniphase all found the releases were valid, properly named the plans' fiduciaries, and fully bound the participants, the courts unanimously held the participants' ability to bring claims under § 502(a)(2) was unaffected by the releases because "[§] 502(a)(2) claims are, by their nature, plan claims." Similarly here, each of the Plaintiffs signed a broad release of their right to bring an action in court—i.e. an agreement to arbitrate—as a condition to their employment. Just as in Bowles, Schering, Johnson, and JDS Uniphase, even if the Court decided the Plaintiffs' releases of their right to bring an action in court are valid, properly name Defendants, and fully bind the Plaintiffs, the Court still must find Plaintiffs' ability to bring claims under § 502(a)(2) is unaffected by the releases because "[§] 502(a)(2) claims are, by their nature, plan claims." Indeed, while the Plaintiffs can "waive [their] individual claims against. . . Defendants, [they can] not waive the claims brought under § 502(a)(2) for the benefit of the [plan] without the consent of the [plan]."

Defendants would have the Court draw a line between (1) participants' ability to release their right to pursue a plan's claims and (2) participants' ability to release their right to pursue a plan's claims in court. Defendants, however, have offered no support for why this line should be drawn. Bowles, Schering, Johnson, and JDS Uniphase each held that it was the plans' refusal to consent (or the plan's absence of consent) that prevented the participants from releasing their § 502(a)(2) claims on the plans' behalf. Just as the plans in Bowles, Schering, Johnson, and JDS Uniphase did not consent to release their right to pursue claims, here the Plans have not consented to release their rights to proceed in court.

Defendants argue that Bowles, Schering, Johnson, and JDS Uniphase only establish the "commonsense principle" that individual participants "obviously cannot abandon claims belonging to others." (Doc. No. 49 at 12–13.) Thus, Defendants argue, the right to pursue a claim is different than the right to file in court because when a participant releases a claim the participant is abandoning something "belonging to others." (Id. at 12.) This is unpersuasive. Indeed, Bowles, Schering, Johnson, and JDS Uniphase did more than just establish participants "obviously cannot abandon claims belonging to others;" these cases held participants could not abandon even their own claims under § 502(a)(2) to sue on the plans' behalf. Further, when a participant releases the right to proceed in court the participant is just as much abandoning something "belonging to others." Indeed, when a plan owns a right, it cannot be bargained away without the plan's consent; it makes no difference whether that right is to a claim or a court trial.

Defendants also argue that an "individual participant is permitted to make a wide range of strategic procedural decisions about how to litigate an ERISA claim

13

without the consent of the Plan, including the venue in which to file suit, the attorney to employ, and the evidence to seek in discovery." (Doc. No. 49 at 13.) Thus, they claim, the choice to arbitrate is no different. This too is unpersuasive. There are significant differences between decisions regarding "the venue in which to file suit, the attorney to employ, and the evidence to seek in discovery," on one hand, and the decision to settle or submit a claim to arbitration, on the other.

Decisions to settle or arbitrate are steadfastly vested with a client, as opposed to the client's attorney, and the decision to settle or arbitrate always requires client consent. Blanton v. Womancare, Inc., 38 Cal. 3d 396, 407 (1985); Toal v. Tardif, 178 Cal. App. 4th 1208, 1221 (2009) ("client is bound by an arbitration agreement signed by his or her counsel only if the client consented to or ratified the agreement"). Decisions as to venue, discovery methods, and evidence to seek in discovery, however, are vested in a lawyer's discretion, as opposed to a client's. Blanton, 38 Cal. 3d at 403–04 ("In retaining counsel for the prosecution or defense of a suit, the right to do many acts in respect to the cause is embraced as ancillary, or incidental to the general authority conferred, and among these is included the authority to enter into stipulations and agreements in all matters of procedure during the progress of the trial. Stipulations thus made, so far as they are simply necessary or incidental to the management of the suit, and which affect only the procedure or remedy as distinguished from the cause of action itself, and the essential rights of the client, are binding on the client."). When a suit is brought on behalf of a plan under § 502(a)(2), the lawyer bringing the suit is litigating the plan's claims. Thus, as the claims belong to the plan, the plan occupies the position of a client, and thus the plan is the one vested with the right to decide when to settle or submit to arbitration. See Bowles, 198 F.3d at 760; Schering, 589 F.3d at 593; Johnson, 2006 WL 2943160

at *2; JDS Uniphase, 2006 WL 2597995 at *2. Similarly, as the plan occupies the position of a client, it need not consent to venue and discovery decisions, as these are generally decisions vested with the lawyer litigating the claims. Thus, even though a plan need not consent to venue and discovery decisions, this division of decision-making authority shows why the plan's consent is still required when settling or submitting a claim to arbitration.

Although the choice of "attorney to employ" is admittedly one that rests with a client, and plans are not required to consent to a participant's choice of attorney, this is a necessary evil of any derivative claim. The nature of derivative claims under § 502(a)(2) make it impossible for plans to consent to an attorney bringing suit because § 502(a)(2) authorizes "a participant, beneficiary or fiduciary" to bring "a civil action" on behalf of the plan against "a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries." Further, the only persons authorized to approve an attorney on a plan's behalf are necessarily fiduciaries of the plan itself. Thus, as the fiduciaries of the plan are very objects of suits brought under § 502(a)(2), it cannot be the case that § 502(a)(2) would require fiduciaries to approve the very attorneys who are suing them. Accordingly, the fact that a plan is not required to consent to a participant's choice of attorney is not a reason to hold it is not required to consent to submit a claim to arbitration.

Further, holding that the participants' arbitration agreements cannot affect their claims under § 502(a)(2) makes practical sense and is closely aligned with the goals of ERISA. One of ERISA's main purposes is "[t]o protect pension plans from looting by unscrupulous employers and their agents." Landwehr v. DuPree, 72 F.3d

726, 733 (9th Cir. 1995). If the Court were to hold participants' arbitration agreements controlled their § 502(a)(2) claims, fiduciaries could mitigate their ERISA obligations to their plans and erect barriers to ERISA enforcement on behalf of plans by requiring employees to sign arbitration agreements—including provisions requiring confidentiality, expedited arbitration procedures, limited discovery, required splitting of arbitrators' fees, and mandatory payment of the prevailing party's attorneys' fees—as a condition of employment. Given that § 502(a)(2) actions are almost exclusively brought by participants, this would (1) guarantee fiduciaries would essentially never be held to account for their potential wrongdoings in court and (2) give fiduciaries many procedural advantages at the outset of any § 502(a)(2) action that they would not be entitled to in a court proceeding. Allowing fiduciaries to limit their ERISA obligations in this manner would directly conflict with the Supreme Court's holding that "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' [and] 'provid [e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004). Indeed allowing such arbitration agreements to control participants' § 502(a)(2) claims would, in a sense, be allowing the fox to guard the henhouse.

Defendants argue Landwehr v. Dupree, 72 F.3d 726, 732 (9th Cir. 1995), requires the Court to hold Plaintiffs' § 502(a)(2) claims on behalf of the Plans are bound by the arbitration agreements. In Landwehr, a retirement plan's fiduciary embezzled money from the plan by writing his personal driver checks from the plan's bank accounts between April 1988 and February 1989. Landwehr, 72 F.3d at 730. The plan's participants learned of these actions in January 1990, and they brought suit on behalf of the plan against a fiduciary in June 1992. Id. at 731. The

fiduciary argued the claims were barred by ERISA's three-year statute of limitations because "the real 'plaintiff' in this case [was] the Plan," and the plan had actual knowledge of the stolen money by at least February 1989 because several of the fiduciaries of the plan knew of the illicit money transfers. Landwehr, 72 F.3d at 732. ERISA's statute of limitations is set forth in 29 U.S.C. § 1113 and states actions for breach of fiduciary duty must be brought before "(1) six years after . . . the date of the last action which constituted a part of the breach or violation, or . . . (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C.A. § 1113. The court reasoned, for the purposes of the statute of limitations, "[t]he plaintiff in such actions . . . is not the plan itself but the fiduciary, beneficiary, or participant bringing suit." Id. Thus, the court held "the limitations period begins to run on the date that the person bringing suit on behalf of the plan learned of the breach or violation." Id. The court explained it ruled thus because,

> [i]f the statute of limitations started to run on the first day that a fiduciary knew of the violation, then the statute of limitations would begin to run on the date that [the fiduciary] breached his duties—or, in the alternative, on the date that agents hired by [the fiduciary] were told of the underlying facts by [the fiduciary] in the course of seeking their advice. That would obviously defeat the purpose of section 1113's requirement that the limitations period run from the date when the plaintiff acquired actual knowledge of the breach, rather than on the date of the breach. Moreover, it would undermine one of the primary purposes of ERISA: To protect pension plans from looting by unscrupulous employers and their agents.

17

Id. at 732–33.

The holding in Landwehr does not suggest the Court should rule a participant can agree to arbitrate § 502(a)(2) claims without a plan's consent. Indeed, Landwehr specifically limited its ruling to issues involving the statute of limitations and the interpretation of the word "plaintiff" as it appears in § 1113. Its decision that a participant was the "plaintiff" for the purposes of § 1113 was necessitated by the wording of § 1113 because holding otherwise would have rendered § 1113(1) a nullity. The Ninth Circuit did not purport to hold a participant is the "plaintiff" for the purposes of agreeing to arbitrate or settle. In fact, doing so would directly conflict with the Ninth Circuit's more recent holding in Bowles.

Additionally, the Ninth Circuit's reasoning for holding a participant was the "plaintiff" for the purposes of § 1113 weighs in favor of this Court ruling that a plan must consent to arbitration before participants are allowed to submit their § 502(a)(2) claims to arbitration. This is because, in Landwehr, the court reasoned that unless it ruled the "plaintiff" was the participant for statutory limitations purposes, the statute of limitations would (1) limit participants' ability to bring claims on behalf of plans and (2) place fiduciaries at a procedural advantage by having the statute of limitations begin to run as soon as a breach of fiduciary duty occurred. Similarly here, for the reasons discussed above, unless the Court rules participants' arbitration agreements cannot control participants' § 502(a)(2) claims on behalf of a plan, the arbitration agreements would (1) limit participants' ability to bring claims on behalf of plans and (2) place plan fiduciaries at a procedural advantage because the terms of arbitration agreements could limit the ease of

bringing § 502(a)(2) claims and the effectiveness of the § 502(a)(2) claims. Accordingly, Landwehr's holding that a participant is the "plaintiff" for statute of limitations purposes does require this Court to hold a participant's arbitration agreement can affect the participant's ability to bring a § 502(a)(2) claim on behalf of a plan in court. Indeed, the reasoning in Landwehr affirmatively supports this Court's decision that a participant's arbitration agreement cannot affect the participant's ability to bring a § 502(a)(2) claim on behalf of a plan in court.[2]

In sum, the Court holds participants cannot sign an arbitration agreement, without the consent of a plan, that prevents the participants from bringing a § 502(a)(2) claim on behalf of the plan. Thus, the Plaintiffs' arbitration agreements do not prevent them from filing their § 502(a)(2) claims in court on behalf of the Plans, and Defendants' motion to compel arbitration of these claims is DENIED.

### C. Individual Arbitration

The Court has ruled Plaintiffs' § 502(a)(2) claims are not required to be arbitrated, and Plaintiffs have brought no claims other than those under § 502(a)(2). Thus, the Court need not address the issue of individualized arbitration.

---

[2] To the extent the Defendants argue the decision to arbitrate is more akin to a statute of limitations issue than the decision to settle, the Court disagrees. Deciding to settle and deciding to arbitrate are both decisions made by clients in the course of litigation. Both concern a party's ability to consent on the behalf of another and whether it would be equitable to do so. The statute of limitations, to the contrary, is a concept that simply determines when suits are too old to be actionable.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to compel arbitration is DENIED.

**IT IS SO ORDERED.**

Dated:  3/23/17

_____
Virginia A. Phillips
Chief United States District Judge