JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
MICHAEL A. WOLFF (admitted *pro hac vice*)
mwolff@uselaws.com
KURT C. STRUCKHOFF (admitted *pro hac vice*)
kstruckhoff@uselaws.com
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone:  (314) 621-6115
Facsimile:  (314) 621-5934
*Class Counsel for All Plaintiffs*

Steven M. Goldsobel (SBN 166405)
steve@sgoldsobel.com
Law Offices of Steven Goldsobel, A Professional Corporation
1901 Avenue of the Stars, Suite 1750
Los Angeles, CA 90067
Telephone: (310) 552-4848
Facsimile: (310) 695-3860
*Local Counsel for All Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**(Western Division)**

| | |
|---|---|
| ALLEN MUNRO, DANIEL C. WHEELER, JANE A. SINGLETON, SARAH WOHLGEMUTH, REBECCA A. SNYDER, DION DICKMAN, COREY CLARK, AND STEVEN L. OLSON, individually and as representatives of a class of participants and beneficiaries on behalf of the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan, | NO. 2:16-cv-06191-VAP-E |
| | SECOND AMENDED COMPLAINT—CLASS ACTION |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, USC RETIREMENT PLAN OVERSIGHT COMMITTEE, LISA MAZZOCCO, ERIK BRINK, TODD DICKEY, DEBRA FABANISH, ELIZABETH GRADDY, JANIS MCELDOWNEY, MICHAEL B. NICHOL, JIM KALEN, PATRICIA RILEY, MARGO STEURBAUT, JEFFREY FISCHER, ALYSA GERLACH, DOUGLAS H. JOINES, ROB COOPER, SAMANTHA FOSTER, MATT CURRAN, AND GREGORY CONDELL, | |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

*Defendants*.

1. Plaintiffs Allen Munro, Daniel C. Wheeler, Jane A. Singleton, Sarah Wohlgemuth (née Sarah Gleason), Rebecca A. Snyder, Dion Dickman, Corey Clark, and Steven L. Olson, individually and as representatives of a class of participants and beneficiaries of the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan (herein collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plans against Defendants University of Southern California, the USC Retirement Plan Oversight Committee, Lisa Mazzocco, Erik Brink, Todd Dickey, Debra Fabanish, Elizabeth Graddy, Janis McEldowney, Michael B. Nichol, Jim Kalen, Patricia Riley, Margo Steurbaut, Jeffrey Fischer, Alysa Gerlach, Douglas H. Joines, Rob Cooper, Samantha Foster, Matt Curran, and Gregory Condell for breach of fiduciary duties under ERISA.[1]

2. ERISA's fiduciary duties "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); 29 U.S.C. §1104(a). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3. Defined contribution plans with billions of dollars in assets, like the Plans—which are among the largest 0.05% of defined contribution plans in the United States—have tremendous bargaining power in the marketplace for

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

retirement plan services, and can demand high-quality administrative and investment management services at low cost. As fiduciaries to the Plans, Defendants are obligated to limit the Plans' expenses to a reasonable amount; to ensure that each fund in the Plans is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plans; and to analyze the costs and benefits of alternatives for the Plans' administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plans' service providers.

4.   Instead of using the Plans' bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plans, Defendants squandered that leverage by allowing the Plans' conflicted third party service providers—TIAA, Vanguard, Fidelity, and Prudential—to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products.

5.   To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

**JURISDICTION AND VENUE**

6.   **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7.   **Venue.** This District is the proper venue for this action under 29

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a.     The named Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent or excessive fee options in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.     The named Plaintiffs and all participants in the Plans were financially harmed by Defendants' improper bundling of some of the Plans' investment products, improperly allowing the companies who did

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

recordkeeping for the Plans to require inclusion of their investment products in the Plans, instead of each investment option being independently selected.

c.     The named Plaintiffs' individual accounts in the Plans were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in the CREF Stock Account, TIAA Real Estate Account and other underperforming investments, which Defendants failed to remove from the Plans when it was clear from past poor performance and their excessive fees that they were imprudent investments, at a time when those options suffered losses compared to the performance of numerous prudent alternatives in which those assets would have been invested had Defendants not breached their fiduciary duties (including Plaintiffs Singleton, Snyder, and Munro), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plans' recordkeepers and higher-cost share classes of mutual funds in the Plans which were priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available for inclusion in the Plans because of the enormous size of the Plans, resulting in a loss of retirement savings (all Plaintiffs), and (3) through the revenue sharing payments from their investments they paid a portion of the Plans' excessive administrative and recordkeeping fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plans, and resulting in a loss of retirement savings (all Plaintiffs).

d.     Specifically, during the class period: Plaintiff Munro invested in the higher-cost share classes of Vanguard Energy Fund, Vanguard Total Stock Market Index, Vanguard REIT Index, Vanguard Inflation-Protected Securities, Vanguard Small Cap Value Index, and Vanguard European Stock Index; Plaintiff Dickman invested in the higher-cost share class of the Vanguard Total International Stock Index and the Vanguard Total Stock

Market Index; Plaintiff Olson invested in the higher-cost share classes of Fidelity Independence, Fidelity Mega Cap Stock, Fidelity Growth Strategies, Fidelity Leveraged Company Stock, Fidelity International Small Cap, Fidelity Overseas, Fidelity International Real Estate, Fidelity Real Estate Income, Fidelity Conservative Income Bond, and Fidelity Export & Multinational.

e.     Finally, all of the Plaintiffs each paid a portion of the Plans' excessive administrative and recordkeeping fees through the revenue sharing payments attributable to their respective investments: Plaintiff Clark invested in Fidelity Blue Chip Growth, Fidelity China, Fidelity Diversified International, Fidelity Real Estate Investment, Fidelity, Small Cap Discovery, Fidelity Mid Cap Enhanced Index, Fidelity Blue Chip Value, Fidelity Contrafund, Fidelity Dividend Growth, Fidelity Focused Stock, Fidelity Growth Company, Fidelity Total Market Index, and Fidelity Value Discovery (and many others); Plaintiff Munro invested in the Vanguard Energy Fund, Vanguard Inflation-Protected Securities and Vanguard Small Cap Value Index (among others); Plaintiff Wheeler invested in the Vanguard Target Retirement 2030; Plaintiff Wohlgemuth invested in the Vanguard Target Retirement 2050;  Plaintiff Singleton and Plaintiff Snyder invested in CREF Stock, CREF Bond Market, CREF Inflation-Linked Bond, CREF Money Market, TIAA Traditional,  and TIAA Real Estate (among others); Plaintiff Dickman invested in the Vanguard Total International Stock Index and the Vanguard Total Stock Market Index; Plaintiff Olson invested in the Fidelity Independence, Fidelity Mega Cap Stock, Fidelity Growth Strategies, Fidelity Leveraged Company Stock, and Fidelity International Small Cap (among others). Through their investments in these funds, each of the Plaintiffs paid excessive investment management fees and each was assessed a portion of the Plans' excessive administrative and recordkeeping fees.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Plaintiffs would have paid less had Defendants monitored revenue sharing, solicited competitive bids, consolidated recordkeepers, or reduced fees to reasonable levels in accordance with their fiduciary duties under ERISA.

## PARTIES

### University of Southern California Retirement Savings Program

9. The University of Southern California ("USC") offers eligible faculty and staff participation in what it refers to as the University of Southern California Retirement Savings Program (the "Program"). The Program includes two underlying plans: the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan.

10. Nearly every employee eligible to participate in the Program has an individual account in both the University of Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan.

11. Participants in the University of Southern California Tax-Deferred Annuity Plan contribute to their individual account through payroll deductions, whereas participants in the University of Southern California Defined Contribution Retirement Plan receive contributions from USC in an amount equal to the sum of: (1) 5% of a participant's annual salary; and (2) the amount contributed by the participant to his or her TDA Plan account up to 5% of his or her annual salary.

### University of Southern California Defined Contribution Retirement Plan

12. The University of Southern California Defined Contribution Retirement Plan (the "DC Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

13. The DC Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1) last amended and restated effective January 1, 2015.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

14.    The DC Plan provides for retirement income for certain faculty and staff of USC. That retirement income depends upon contributions made on behalf of each employee by his or her employer, matching contributions made on behalf of qualifying employees, and performance of investment options net of fees and expenses.

15.    As of December 31, 2010, the DC Plan held $1.4 billion in assets and had 23,196 participants with account balances. It is one of the largest defined contribution plans in the United States and ranked in the top 0.047% in asset size of all defined contribution plans in the United States that filed a Form 5500 with the Department of Labor.  Plans of such great size are commonly referred to as "jumbo plans."

### University of Southern California Tax-Deferred Annuity Plan

16.    The University of Southern California Tax-Deferred Annuity Plan (the "TDA Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

17.    The TDA Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1) last amended and restated effective January 1, 2015.

18.    The TDA Plan provides for retirement income for certain faculty and staff of USC. That retirement income depends upon deferrals of employee compensation and performance of investment options net of fees and expenses.

19.    As of December 31, 2010, the TDA Plan held $1.6 billion in assets and had 18,843 participants with account balances. This "jumbo plan" ranks in the top 0.045% in asset size of all defined contribution plans in the United States that filed a Form 5500 with the Department of Labor.

20.    The Plans allow participants to designate investment options into which their individual accounts are invested. Defendants exercised exclusive and discretionary authority and control over the investment options that are included in

the Plans.

**Plaintiffs**

21.    Allen Munro is a Research Professor Emeritus at the Rossier School of Education at USC and resides in Manhattan Beach, California. He is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

22.    Daniel C. Wheeler is a Network Administrator at USC and resides in El Monte, California. He is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

23.    Jane A. Singleton was an Assistant Director of Purchasing Services at USC and resides in Azusa, California. She is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

24.    Sarah Wohlgemuth (née Sarah Gleason) was a Technical Grant Writer at USC and resides in Kansas City, Kansas. She is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

25.    Rebecca Snyder was a Direct Marketing Bookstore Manager at USC and resides in Torrance, California. She is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans.

26.    Dion Dickman is an Assistant Professor in the Department of Neurology/Biology at USC and resides in La Crescenta, California. He is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

27.    Corey Clark is a Distance Learning Operations Supervisor at USC and resides in Glendale, California. He is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Plans.

28.     Steven L. Olson is a Building Systems Manager in the Cinematics Arts Department at USC and resides in Santa Clarita, California. He is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plans.

### Defendants

29.     USC is a non-profit corporation organized under California law with its principal place of business in Los Angeles, California. The DC Plan and the TDA Plan designate USC as the fiduciary of the Plans with responsibility for the control, management, and administration of the Plans, in accordance with 29 U.S.C. §1102(a). USC is the Plan administrator for both Plans under 29 U.S.C. §1002(16)(A)(i), and has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

30.     Under Section 8.2(h) of the DC Plan and Section 7.2(g) of the TDA Plan, USC may delegate its fiduciary responsibilities and designate other persons, including a committee, to carry out its fiduciary responsibilities, only by written instrument and in accordance with 29 U.S.C. §1105.

31.     USC is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

32.     Effective March 2, 2016, USC approved a "Committee Charter" that

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

formally "constitute[d]" the USC Retirement Plan Oversight Committee ("Committee"). The Charter provides that the Committee shall serve as the plan administrator and named fiduciary for the Plans. In accordance with the Charter, the Committee was delegated fiduciary responsibility over the administration and investment of the Plans' assets, including: selecting and monitoring the Plans' investment options; selecting vendors and implementing contractual service arrangements; developing investment objectives, policies, and procedures for the Plans; and monitoring and controlling investment and administrative fees paid from the Plans to ensure those fees are reasonable for the services provided.

33.     The Committee has been comprised of 8 members, each serving in an *ex officio* capacity from USC's treasury, finance and administrative operations offices. The Charter provides that the members will include the following officers:

-Senior Vice President for Administration

-Chief Investment Officer

-Comptroller

-Associate Senior Vice President, Human Resources

-Vice President, Office of Budget and Planning

-Vice Provost for Academic and Faculty Affairs

-Director, Retirement Plan Administration

-Chair of the Employee Benefits Committee

34.     A document called the "Retirement Plan Oversight Committee" prepared in March 2010 purports to identify the "Charge" of the Committee and lists the "Committee Members". The following officers are listed for the Committee:

-Treasurer (Chair)

-Comptroller

-Associate Senior Vice President, Administrative Operations

-Vice President, Office of Budget and Planning

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

-Associate Treasurer

-Director, Retirement Plan Administration

-Chair of the Employee Benefits Advisory Committee

35.     The same document was purportedly updated as of May 2011 that lists the following officers for the Committee:

-Chief Investment Officer (Chair)

-Comptroller

-Associate Senior Vice President, Administrative Operations

-Vice President, Office of Budget and Planning

-Managing Director, USC Investment Office

-Director, Retirement Plan Administration

-Chair of the Employee Benefits Advisory Committee

36.     Because USC appointed members of the Committee based on whatever individuals occupy USC offices, USC never screened individuals for their qualifications and suitability to be an ERISA fiduciary for the Plans.

37.     Before March 2016, the Committee was supposed to advise the Senior Vice President for Administration on matters related to the Plans, including establishing the Plans' investment policies; advising on and monitoring the administration of the Plans; monitoring the investment performance of Plan investments; evaluating the products and services provided to the Plans to ensure that fees paid by participants were reasonable; and making recommendations to the Senior Vice President for Administration on changes to the investment policy, services providers, products, and services.

38.     Lisa Mazzocco is the current chair of the Committee and serves as USC's Chief Investment Officer. She has been a member of the Committee since 2011. In addition to her role as a fiduciary committee member, she advises the investment and finance committee of the USC Board of Trustees with respect to USC's endowment performance and directly reports to the President of USC.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

39.     Erik Brink is USC's Associate Senior Vice President and University Comptroller. He has served as a Committee member since 2011.

40.     Todd Dickey is USC's Senior Vice President for Administration and has served in that role since 2009. He has been a member of the Committee since 2014.

41.     Debra Fabanish is USC's Director, Retirement Plan Administration and has held that position since at least 2013. She has served as a Committee member since at least 2014.

42.     Elizabeth Graddy is USC's Executive Vice Provost and previously served as Vice Provost of Academic Affairs. She has served as a Committee member since 2015.

43.     Janis McEldowney is USC's Associate Senior Vice President of Human Resources and has served in this position since 2002. She has served as a Committee member since at least 2014.

44.     Michael B. Nichol is the Vice Dean for Faculty Affairs and has served in this position since at least 2002. He has served as a Committee member since 2015.

45.     Jim Kalen is USC's Associate Vice President and Executive Director of Budget. He served as a Committee member in 2016 and 2017.

46.     Patricia Riley is an Associate Professor of Communication at USC. She has served as a Committee member since 2017.

47.     Margo Steurbaut formerly served as Vice President for Finance at USC. She served in that position until 2016. She served as a Committee member from 2010 to 2016.

48.     Jeffrey Fischer served as USC's Interim Chief Investment Officer in 2010 and assumed the role of Managing Director in 2011. He served as a Committee member in 2010 and 2011.

49.     Alysa Gerlach previously served in the following positions at USC,

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Assistant Treasurer and Assistant Vice President of Treasurer. She served as a Committee member in at least 2011.

50. Douglas H. Joines is Professor of Finance and Business Economics at USC. He previously served as Director of International Experimental Learning Programs. He served as a Committee member in at least 2011.

51. Rob Cooper served as Vice Provost for Academic Operations and Strategy at USC until 2015. He served as a Committee member in at least 2015.

52. Samantha Foster served as a Committee member in at least 2014 and is USC's Investment Officer.

53. Matt Curran is Director, Trademarks and Contract Compliance at USC. He served as a Committee member in 2014 and 2015.

54. Gregory Condell is the Vice President of Finance at USC. He served as a Committee member in at least 2017.

55. The Committee and its individual members are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have discretionary authority or discretionary responsibility in administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

## ERISA'S FIDUCIARY STANDARDS

56. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a
> plan solely in the interest of the participants and
> beneficiaries and –
>
> (A)    for the exclusive purpose of
>
>        (i)    providing benefits to participants and their

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

beneficiaries; and

(ii)   defraying reasonable expenses of

administering the plan;

[and]

(B)   with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of

like character and with like aims.

57.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A .

58.   "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)(fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)(emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Opinion 98-04A (1998); DOL Adv. Opinion 88-16A (1988). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

59.    The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
>             * * *
>
> (C)    furnishing of goods, services, or facilities between the plan and  a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –
>
> (1)    deal with the assets of the plan in his own interest or for his own account,
>
> (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

> (3)    receive any consideration for his own personal
> account from any party dealing with such plan in
> connection with a transaction involving the assets of the
> plan.

60.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

61.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

62.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

**I.    Defined contribution plans, services, and fees.**

63.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255.

64.    These plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct the plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

65.    The majority of fees assessed to participants in a defined contribution

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1826.

66. The plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

67. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans such as the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

68. The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly

---

[2] http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

69. Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II. Defined contribution recordkeeping.

70. Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

71. There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.,* recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate

themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

72.     Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

**III.     Defined contribution investment options.**

73.     Defined contribution fiduciaries have exclusive control over the particular investment options available in a plan. Plan participants direct and allocate the assets in their accounts to one or more of these options, and the investment returns are credited to participants' accounts.

74.     Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

75.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

76.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

77.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

78.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

79. The importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (*citing* Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function[.]" *Tibble v. Edison Int'l,* 843 F.3d 1187, 1198 (9th Cir. 2016)(*quoting* Restatement (Third) of Trusts § 90 cmt. b). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

80. Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

81.   In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[4] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

82.   To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*,

---

[4] http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

55 J. Fɪɴ. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

83.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fɪɴ. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fɪɴ. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

84.    Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

**IV.    Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.**

85.    There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

86.    In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing

services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

87.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

88.    As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

89.    Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for the services to be provided to the plan.

90.     Defendants used a different method of paying for recordkeeping for the Plans, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

91.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, have not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

92.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

93.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plans, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have also declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of independent consultant that "'without an actual fee quote comparison'—*i.e.*, a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

94.     Industry experts recognize that this principle applies fully in a university 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*.[5] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*.[2] Engaging in in this RFP process "allows plan sponsors . . .to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves

---

[5] http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2

overall plan operation." *Id.*

95.    Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years. In fact, the Department of Labor recognized in July 2010 that "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).

## V.    Bundled services and open architecture.

96.    As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant caveat—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of hand-picked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

97.    In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, and can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

98.     Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it also provides revenue sharing.

## VI.     403(b) plans share common fiduciary duties with 401(k) plans.

99.     Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

100.   Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plans have never qualified for the safe harbor, and thus have long been subject to ERISA's fiduciary requirements. In the Plans' annual reports (Form 5500) filed with the Department of Labor, Defendants have acknowledged that the Plans are subject to ERISA.

101.   Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plans that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plans' status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plans for the exclusive benefit of participants.

102.   When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding

mutual fund shares. 26 U.S.C. §403(b)(7).

103.   Regardless of these differences, 401(k) and 403(b) plans both have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that those savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

**VII.   Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.**

104.   As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

105.   Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[6] Indeed,

---

[6] http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

## VIII.   TIAA-CREF's bundled 403(b) plan services.

106.   TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America ("TIAA"), and College Retirement Equities Fund ("CREF"). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

107.   Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups."[7] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

108.   While CREF is organized as a New York not-for-profit

---

education-what-is-a-plan-sponsors-responsibility-to-participants.
[7] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. TIMES (July 30, 2007), http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as well. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[8]

109.    TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income tax returns:

| Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |

---

[8] https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment Management Holding, Inc. | | X |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See* 2015 Annual Statement of the Teachers Insurance and Annuity Association of

America (Jan. 26, 2016), at 39.[9]

110.   Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[10] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies. In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. *Id.*

//

//

//

//

//

//

//

//

//

//

[9] This list does not include the hundreds of TIAA's for-profit, joint venture subsidiaries, all of which are controlled by TIAA. *See id.* at 112-19; *see also* https://www.sec.gov/Archives/edgar/data/1429401/000119312510093446/dex21.htm

[10] TIAA Compensation Disclosures, Executive Compensation Discussion and Analysis 20 (May 2016), https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

1
2
3
4
5
6
7
8
9
10
11
12
13
14

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102



15   111.   Adding to this, and undercutting any claim that it operates as a non-

16   profit, TIAA's compensation disclosures further state that its employees'

17   compensation and benefits programs are linked to "*profitability*."[11] (emphasis

18   added).

19   112.   Responding to criticism that TIAA-CREF's CEO and other executives

20   "garnered salaries and bonuses significantly greater than similar pension fund

21   operations," TIAA-CREF responded that such extremely high pay was justified

22   because "the company had to compete for top-level employees with major financial

23   services corporations."[12] Critics found this justification dubious because the

24   _____

25   [11] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 3 (May 2016),
https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

26   [12] Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*, http://www.fundinguniverse.com/company-

27   histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

28

"flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

113.   Upon information and belief, TIAA and the other Plan service providers, including Fidelity and Vanguard, used their position as recordkeepers to obtain access to participants, learning their ages, length of employment, contact information, the size of their accounts, and choices of investments, and used that information for their benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement. This has been documented by former TIAA employees in multiple reports in the New York Times.[13]

114.   A New York Times article dated November 9, 2017, states that New York's attorney general has issued subpoenas to TIAA for documents related to its "dubious" sales practices. *Id.* The article goes on: "TIAA has previously said it puts its clients first and has maintained that because its 855 financial advisers and consultants do not receive commissions on the products they sell they are unbiased. But former employees and TIAA regulatory filings challenge this view, pointing out that the company awards bonuses to sales personnel when they steer customers into more expensive in-house products and services." *Id.* The article also describes how TIAA's role as a recordkeeper provides TIAA with access to sell individuals additional retail products including IRAs. "Most of TIAA's clients invest with the firm because their employers have hired it to administer their workers' retirement

---

[13] Gretchen Morgenson , *The Finger-Pointing at the Finance Firm TIAA*, N.Y. TIMES, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-financefirm-tiaa.html. *See also* Gretchen Morgenson, *TIAA Receives New York Subpoena on Sales Practices*, N.Y. TIMES, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaasubpoena.html.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

plans . . . The company earns a record-keeping fee from the institutions whose accounts it overseas, but can generate far more revenue when investors buy its annuities and funds. This presents the potential for conflict." *Id*.

115. The value of TIAA's use of its position as a recordkeeper to the Plans to market and sell lucrative products to soon-to-be-retired participants and retired participants was substantial and far greater than would be true of recordkeepers who do not sell investment products, thus conveying a stamp of approval by Defendants of TIAA and the other Plan service providers who marketed their products.

116. Despite this, and upon information and belief, Defendants allowed TIAA and the other Plan service providers to market and sell their services and investment products in this way, benefitting TIAA and the service providers enormously, yet obtaining no benefit to the Plan from this, either by reduced recordkeeping fees or requiring TIAA and the other service providers to make direct payments to the Plans for the use of this information. This is even more lucrative to TIAA and the other Plan service providers because Defendants are using them as recordkeepers and using their products. Upon information and belief, the Plan's other service providers—Vanguard, Fidelity, and Prudential—also took part in this practice.

117. The Committee minutes and meeting materials that Defendants have produced to date do not show that USC or the Committee considered or took into account the practice of the Plans' recordkeepers marketing and selling non-Plan products and services to Plan participants. They never inquired into whether this practice was occurring and never determined the value to the recordkeepers from engaging in this practice. Defendants took no action to prevent it or ensure that the Plans obtained a benefit either through reduced recordkeeping fees or direct payments to the Plans.

118. In benchmarking (and justifying) its executives' compensation

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

119.    TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, USC fiduciaries locked the Plans into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would become imprudent in the future*. By accepting this arrangement, Defendants failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendants used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

120.    There is no shortage of high-quality, low-cost alternatives to TIAA's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

blend mutual fund investments in the market that provide far superior returns to the CREF Stock account at much lower cost. Fiduciaries of 403(b) defined contribution plans must engage in a cost-benefit analysis to evaluate each investment option and determine whether it is prudent and in the exclusive best interest of participants, in light of TIAA's restrictions and the presence of superior alternatives in the market, to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendants failed to perform such an evaluation of the funds and services TIAA required. Defendants also failed to evaluate whether participants would be better served by using superior low-cost alternatives to TIAA's products when they could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and changed their plans for the benefit of participants.

## IX.   Move to consolidation and open architecture in 403(b) plans.

121.   Under the 2007 final regulations that became effective January 1, 2009,[14] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. The DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009 that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. These regulations are expressly intended to make 403(b) plans more like 401(k) plans.

122.   Once the final regulations were published, many 403(b) plan

---

[14] The DOL gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

fiduciaries recognized that fulfilling their fiduciary obligations required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. While the Plans have long been subject to ERISA because their employer match was sufficient for the Plans to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed, Defendants have informed the Department of Labor in the Plans' Forms 5500 that the Plans are subject to ERISA—even if they had not previously been subject to ERISA's requirements, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

123.    Once these regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented changes to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

124.    For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that, "Recordkeeping must be consolidated and/or managed by a single party."[15] Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a Aon Hewitt), to issue a request for proposal to seven different 403(b) recordkeeping

---

[15] *See* LMU 403(b) Retirement Plan Project Overview, at 1, http://www.lmu.edu/AssetFactory.aspx?vid=33038.

providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[16] LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009.[17] Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." LMU was therefore able to offer "best in class" funds in each fund category.[18]

125.    Similarly, the fiduciaries of the Pepperdine University Retirement Plan recognized the implications of maintaining four different recordkeepers. In order to comply with the regulations and its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "Consolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole administrator scenario)."[19] Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a

---

[16] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.
[17] LMU 403(b) Retirement Plan Project Overview, at 2.
[18] *Id.* at 6.
[19] *See* Pepperdine University Participant Q & A, http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

streamlined compliance process and simplified data coordination.[20] Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option."[21] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."[22]

126.    Pepperdine also recognized that the bundled model demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—*whether or not those investments offered participants the best range of choice, value, and relative performance*." [23] (emphasis added). Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'"[24] After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."[25]

127.    In the fall of 2008, Purdue University began a comprehensive review

---

[20] *Id.*
[21] Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO, http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." (emphasis added).[26] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a Aon Hewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options."[27] Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." (emphasis added).

128. Likewise, California Institute of Technology (CalTech) TIAA-CREF

---

[26] James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University, http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx. (emphasis added).

[27] *Id*.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE. 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting.[28] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Form 5500s filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

129.   Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

130.   In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a Aon Hewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices.[29] Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."[30]

131.   Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings.

---

[28] *Caltech Names TIAA-CREF Recordkeeper,* Institutional Investor (Dec. 10, 2009), http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.
[29] Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014), https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%2 0White%20Paper.pdf.
[30] *Id.* at 3.

Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff."[31] "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model."[32] Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."[33]

132.   *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants."[34] An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

133.   Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[35]

134.   Annual surveys by Plan Sponsor Council of America found that in

---

[31] *Id.* at 4.
[32] *Id.* at 5.
[33] *Id.*
[34] *Id.* at 6.
[35] http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

each year from 2010 through 2014, unlike the USC Plans, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[36] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[37]

135.   The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[38] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from."[39] Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

136.   AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

---

[36] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.
[37] PSCA's 2010 Benchmarking Survey of 403(b) Plans, at 45.
[38] https://www.standard.com/pensions/publications/14883_1109.pdf.
[39] *Id.*

pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[40]

137.   Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[41]

138.   The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.,* Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[42] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to

---

[40] https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[41] https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[42] http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

continue overseeing multiple vendors.").[43]

139.   Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[44]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

140.   The use by Defendants of multiple recordkeepers and proprietary funds required by the recordkeepers to continue to be included in the Plans demonstrates that, in contrast with the comprehensive plan reviews conducted by the 403(b) plan fiduciaries described above, Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plans, Defendants would not have allowed the Plans to continue to pay excessive administrative fees; would not have maintained an inefficient multi-recordkeeper structure; would not have continued to include over *350* investment options in the Plans, including duplicative funds in numerous investment styles and higher-cost retail share classes for which an identical lower-cost version of the same fund was available; and would not have retained investment options in the Plans despite a

---

[43] http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[44] http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

## I.   The Plans' investments

141.   USC employees and retirees who participate in the Plans do not decide which investment options are placed in the Plans. It is Defendants who select investment options in the Plans and it is Defendants who have the responsibility for removal of imprudent options.

142.   Before March 2016, Defendants selected and retained over *350* investment options, which included mutual funds and insurance company fixed and variable annuity products. The mutual fund options included high-priced *retail* share class mutual funds, despite the massive size of the Plans and the readily available low-priced institutional share classes. These retail share class mutual funds are designed for small individual investors and are identical in every respect to the institutional share class funds, except for much higher fees.

143.   The Plans' investments options were offered by four separate recordkeepers to the Plans. These recordkeepers included: Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF" or "TIAA"), the Vanguard Group, Inc. ("Vanguard"), Fidelity Investments Institutional Operations Company ("Fidelity"), and Prudential Trust Company and Prudential Insurance Company of America (collectively, "Prudential"). With the exception of approximately twelve investment options, more than 340 investments were proprietary investments of these four recordkeepers. Thus, over 96% of the available investment options were proprietary products of the four recordkeepers in the Plans.

144.   Among the available investments in the Plans as of December 31, 2010, 28 were TIAA options holding $1.9 billion in Plan assets, 89 were Vanguard options holding $255 million in Plan assets, 174 were Fidelity options holding $792 million in Plan assets, and 34 were Prudential options holding $80 million in Plan

assets.[45]

145.    The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent on the claims-paying ability of TIAA.

146.    The Plans' CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities in a given investment style. Like mutual funds, the value of the Plans' investment in these variable annuities changes over time based on investment performance and expenses of the accounts. They have no guaranteed return.

147.    The remaining TIAA funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge other expenses depending on the type of investment and share class.

148.    USC participants, as with any participant in a retirement plan, receive no benefit from these marketing fees.

149.    The Prudential investment options in the Plans included both variable annuities and mutual funds.

150.    Mutual funds have shareholders who are not participants in the Plans, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in the mutual funds, including participants in the Plan, pay these expenses set forth above.

151.    As discussed in further detail below, in March 2016, Defendants made

---

[45] The Plans also hold assets in SunAmerica investment products. However, effective July 2007, new contributions were frozen to these investments.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

certain changes to the Plans. They removed Prudential as one of the Plans' recordkeepers for future contributions, eliminated hundreds of mutual funds, removed certain fixed and variable annuity investment options, and froze contributions to certain other fixed and variable annuity investment options. The changes made by Defendants in March 2016 resulted in participants now being offered a total of approximately 34 investment options across the Plans' three remaining recordkeepers.[46]

152.   These changes eliminated many duplicative funds, which had diluted the Plans' ability to obtain lower fees. However, despite these changes, and as set forth in further detail below, Defendants continue to include high-priced investment options in the Plans, retain three recordkeepers, and continue to allow excessive recordkeeping fees to be charged to the Plans.

**II.   Defendants continued to improperly allow TIAA to require inclusion of its investment products in the Plans and to require that it provide recordkeeping services for its proprietary options.**

153.   ERISA requires fiduciaries to independently evaluate the prudence of each investment option included in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments no matter how long they have been in the plan, *Tibble*, 135 S. Ct. at 1828–29.

154.   As noted, TIAA offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By linking use of TIAA as a recordkeeper to mandatory inclusion and retention of these funds in the Plans, TIAA drove uncapped revenue to its recordkeeping arm.

155.   TIAA's financial interests were also served insofar as TIAA was able

---

[46] The Plans' target date funds are counted as a single investment option.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

to use its position as recordkeeper to obtain access to the Plans' participants, acquiring information about their ages, length of employment, contact information, the size of their accounts, and choices of investments, and then used this information for its benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement.

156.   By causing the Plans to maintain such a bundled arrangement with TIAA, Defendants agreed to continue to lock its employees into funds which USC did not analyze. In fact, USC has maintained its "partnership" with TIAA for over 60 years. USC allowed this arrangement to continue despite the DC Plan and the TDA Plan granting USC the express authority to "change or replace" the Funding Agents, which means an insurance company issuing an annuity contract under which contributions are made to the Plans or the trustee of any trust to which contributions are made, and the investment options offered to Plan participants. The terms of the Plans govern USC's actions. *See* 29 U.S.C. §1104(a)(1)(D).

157.   It can never be prudent to continue to lock a fund into a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates the ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plans, whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants, and whether the CREF Stock Account and CREF Money Market Account were in the exclusive interest of participants, reasonably priced, and prudent investment options. Instead of acting solely in the interest of participants, Defendants allowed TIAA's financial interest to dictate the Plans' investment selections and recordkeeping arrangement. Because Defendants allowed the CREF Stock Account

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

to continue to be locked into the Plans, Defendants did not satisfy their duty to evaluate on an ongoing basis the CREF Stock Account for retention in the Plans, and whether it should be removed if imprudent at any time after inclusion. As a result of Defendants' breach in allowing the CREF Stock Account to be retained in the Plans because TIAA demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plans suffered massive losses compared to prudent alternatives, as discussed in more detail below.

158.   Both Plans offer the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in TIAA's general account and are dependent on TIAA's claims-paying ability.

159.   The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. The only way for these participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless this substantial penalty is paid. Thus, any of these participants who wish to withdraw their savings without penalty can only do so over ten years.

160.   Both Plans include TIAA's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

161.   The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

a.   "administrative expense" charge (24 bps);[47]

b.   "distribution expense" charge (9.5 bps);

c.   "mortality and expense risk" charge (0.5 bps); and

d.   "investment advisory expense" charge (ranging from 4 to 12.5 bps).

162.   Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA to Plan participants, and the other two provide no benefit to the Plans' participants.

a.   **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plans' assets outpaced the growth in participants, the fees paid to TIAA likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

b.   **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to

---

[47] Expenses are stated as of May 1, 2014.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

participants with no benefit.

**c.   Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the USC Plans, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

**d.   Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE. 1200
ST. LOUIS, MO 63102

lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as USC's, can command extremely low fees. Despite this recognized principle, TIAA has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plans' fiduciaries did not obtain the lower investment management fees that come with the Plans' enormous asset size. As a result, the Plans, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA and excessive fees paid by USC's employees and retirees.

163. The excessiveness of this investment management fee is even more egregious because of the way critics have documented that CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶112.

164. The TIAA Real Estate Account is an insurance separate account maintained by TIAA. An insurance separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but is segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

a. "administrative expense" charge (26.5 bps);

b. "distribution expense" charge (8 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee" (18 bps); and

e. "investment management expense" charge (36.5 bps).

165.   The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst), which has a *total* expense ratio of 8 bps. *See infra* ¶¶283–284.

166.   The remaining TIAA funds are mutual funds. The Fidelity and Vanguard investment options offered to Plan participants are exclusively mutual funds. The TIAA-CREF, Fidelity, and Vanguard mutual funds charge varying amounts for investment management, but also charge lower investment management fees for lower-cost institutional shares.

## III.   Defendants caused the Plans to pay excessive administrative and recordkeeping fees.

167.   As set forth above, the market for recordkeeping services is highly competitive, and there are numerous recordkeepers in the market who can provide a high level of service to large defined contribution plan who will readily respond to a request for proposal. Defendants admit "that there is competition in the recordkeeping market, that many recordkeepers…provide the high-quality service to defined contribution plans, and will respond to requests for proposals." Doc. 73 ¶141.

168.   Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

169.   As set forth above, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

recordkeepers eliminates a plan's leverage. Instead of obtaining pricing based on a 28,000 participant plan—or 58,000 between the two Plans—from one recordkeeper, Defendants spread recordkeeping of participants among multiple recordkeepers—who pushed their own products on the Plans. This took away the USC Plans' ability to obtain favorable pricing.

170.   Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continue to contract with *three* recordkeepers (TIAA, Fidelity, and Vanguard). Prior to March 2016, Defendants also contracted with Prudential to receive active participant contributions, for a total of *four* recordkeepers for the Plans. The inefficient and costly structure maintained by Defendants has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for recordkeeping and administrative services. There is no loyal or prudent reason for Defendants' failure to engage in a process to reduce duplicative services and the fees charged to the Plans long before March 2016, and before 2009, or to continue with three recordkeepers to the present.

171.   Defendants never assessed the prudence of maintaining multiple recordkeepers after considering the benefits the Plans would have achieved under a single recordkeeping structure. Not until *August 2015* did Defendants receive any recordkeeping proposals from any recordkeeper to provide recordkeeping and administrative services to the Plans. However, none of these proposals provided pricing under a single recordkeeper arrangement based on the Plans' *total* assets and participants. Rather, the proposals were based on pricing for the assets and participants currently maintained on each respective recordkeeper's platform.

172.   Only TIAA submitted a proposal as a sole provider based only on those assets currently maintained on its recordkeeping platform. When the Committee decided to maintain three recordkeepers, it failed to provide any reasons for this course of action. It did so even though the three recordkeeper arrangement would result in the Plans participants paying *258% more annually—or $1.8*

*million*—than they would have paid even under TIAA's sole provider bid.[48] And the compensation paid to the Plans' recordkeepers would result in a surplus (or *exceed* the purported required revenue threshold demanded by each recordkeeper).

173.   The Plans' *four* active recordkeepers prior to March 2016 received compensation for providing such services through per-participant fees and revenue sharing payments from the Plans' investments.

174.   Instead of obtaining a flat per-participant rate or sufficient rebates of excessive revenue sharing back to the Plans, Defendants allowed these recordkeepers to collect excessive asset-based revenue sharing as payment for administrative services.

175.   Based upon information from industry experts, the Plans' TIAA investments kicked back the following amounts of asset-based revenue sharing to TIAA:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

176.   Fidelity and Vanguard were and are compensated for recordkeeping services based on internal revenue sharing they receive from their proprietary Fidelity or Vanguard mutual funds and/or direct payments from the Plans.

---

[48] Calculation determined based on applying proposed asset-based fee to assets held on each provider's platform.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Similarly, Prudential was and is compensated based on revenue sharing payments from its proprietary investment options that remain in the Plans.

177.   In addition, the Plans' recordkeepers receive additional indirect compensation, including revenue sharing from non-proprietary funds provided to the Plans on their recordkeeping platform, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

178.   Instead of discharging their fiduciary duties to act prudently and in the exclusive interest of participants, Defendants served TIAA's, Vanguard's, Fidelity's, and Prudential's financial interests. Instead of conducting a request for proposals for recordkeeping and evaluating the prudence of retaining each fund in the Plans, Defendants placed and retained proprietary funds of the recordkeepers in the Plans that would provide them with steady streams of compensation from revenue sharing payments and investment management fees.

179.   Defendants were also required under ERISA to determine and monitor all sources of TIAA's, Vanguard's, Fidelity's and Prudential's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. Had Defendants discharged those duties, they would not have selected and retained as Plan investments options proprietary funds of the Plans' recordkeepers while failing to consider non-proprietary alternatives, and would not have allowed the Plans to pay the following excessive sums for recordkeeping.

180.   Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plans likely would have been able to obtain had the fiduciaries put the Plans' recordkeeping services out for competitive bidding. Based on the Plans' features, the information available to Plaintiffs regarding the nature and type of administrative services actually provided by the Plans' recordkeepers, the Plans' combined participant level (roughly 58,000), and the market rates obtained for

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

similar plans, a reasonable annual recordkeeping fee for the Plans would have been a fixed amount of approximately $1,740,000 (or approximately $30 per participant with an account balance).

181. Even if Defendants had negotiated a reasonable recordkeeping fee for the DC Plan and TDA Plan separately, the Plans would have paid dramatically less for recordkeeping services. A reasonable recordkeeping fee for the Plans under these circumstances would have been a fixed amount of approximately $875,000 (or approximately $35 per participant with an account balance).

182. The reasonable recordkeeping fee set forth above (¶¶180–181) is without taking into account the benefit that the recordkeepers receive from marketing and selling non-Plan products and services.

183. Based on the direct and indirect compensation levels shown on the Plans' Form 5500s filed with the Department of Labor, and according to the internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options alone, each Plan paid up to $130 per participant per year from 2010 through 2017, which is well over *300%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

184. Publicly available data reflecting recordkeeping fees charged to defined contribution plans demonstrates that Defendants could have obtained a reasonable recordkeeping fee for the Plans. For example, the Massachusetts Institute of Technology's Supplemental 401(k) Plan with 18,268 participants with account balances as of December 31, 2014 obtained a $33 per-participant fee from Fidelity as the single recordkeeper effective April 2014.[49] The California Institute of Technology TIAA-CREF DC Retirement Plan obtained a $29 per participant fee

---

[49] MIT Supplemental 401(k) Plan Form 5500 (2014); *Tracey, et al. v. Massachusetts Institute of Technology*, Docs. 24-2, 24-3, 16-1162-NMG (D. Mass.).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

from TIAA under a single recordkeeping arrangement as of 2013.[50] The Harvard University Retirement Program obtained recordkeeping fees of $34 per participant from Vanguard and $37 per participant from Fidelity.[51] The North Carolina 403(b) Program obtained a $31 per-participant fee from Prudential.[52] The 401(k) Savings and Profit Sharing Plan for Employees of Nike, Inc. obtained a $30 per participant fee in 2010 and $21 per participant in 2012 and 2016.[53] And the Chevron Employee Savings Investment Plan obtained a $23 per participant annual recordkeeping fee from Vanguard in 2013.[54]

185.   The actual excessive amount paid by the Plans' participants is greater than the millions set forth above because this amount does not reflect all asset-based revenue sharing payments Prudential (as well as SunAmerica) received for recordkeeping and administrative services from their proprietary variable annuities and mutual fund products. This information was not disclosed to Plan participants.

186.   To discharge its fiduciary duties, Defendants were required to obtain sufficient information to determine all sources of compensation received by the Plans' recordkeepers, including the amount of any revenue sharing payments, and

---

[50] This amount is determined based on the CalTech Plan's 2013 Form 5500. The notes to the financial statements (at 33) states the "TIAA-CREF recordkeeping expenses are limited to an annual per-participant maximum amount that is negotiated with the Plan sponsor." For December 31, 2013, TIAA-CREF transferred $7,002,000 in revenue credits to the Plan and paid $507,000 in Plan administration expenses. Based on the Plan's participants as of 2013 (17,247), the Plan paid approximately $29/participant or ($507,000/17,247).

[51] Harvard's August 2018 Fee Disclosure, https://hr.harvard.edu/files/humanresources/files/fee_disclosure.pdf. Based on the Forms 5500s, as of 2016, the Tax-Deferred Annuity Plan had 31,436 participants with account balances and $1.9 billion in assets, and the Defined Contribution Plan had 17,058 participants with account balances and $806 million in assets.

[52] See North Carolina Retirement Plans Letter dated Sept.15, 2016, https://www.nctreasurer.com/ret/Board%20of%20Trustees/SRP%20BOT%20403(b)%20RK%20Contract%20Terms%209%2015%2016.pdf.

[53] See 401(k) Savings and Profit Sharing Plan for Employees of Nike, Inc. Forms 5500 (2010, 2012, 2016). The number of participants with account balances were as follows: 15,428 (2010), 19,362 (2012), 26,568 (2016).

[54] White v. Chevron Corp., No. 16-793, Doc. 47-7 at 4, 6 (C.D. Cal.). The Chevron plan had 40,086 participants with account balances as of December 31, 2013. See Chevron Employee Savings Investment Plan Form 5500 (2013).

to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided. *George*, 641 F.3d at 798–99. Defendants failed to do so, causing the Plans' participants to lose millions of dollars in retirement savings as a result.

187.   Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. They expressly admit that they failed to engage in a formal bidding process for recordkeeping services prior to March 2016. Doc. 73 ¶157. A competitive bidding process for the Plans' recordkeeping services would have produced a reasonable recordkeeping fee for the Plans. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

188.   Defendants never solicited competitive and reliable bids from qualified recordkeepers, particularly under a single recordkeeper arrangement. In fact, the records of the Committee do not indicate that the Committee received recordkeeping bids from more than one candidate to provide recordkeeping and administrative services under a single recordkeeper arrangement. Only in *August 2015* did the Committee receive any bids (albeit not in response to an RFP) from the Plans' existing recordkeepers, and only TIAA submitted a bid as a sole provider. This bid was wholly insufficient because it was provided as a percentage of assets rather than on a fixed or per-participant basis and no other bid was provided by other recordkeepers in order for Defendants to assess the reasonableness of any proposal. Without converting the asset-based bids to a per-participant basis, Defendants could not make an informed assessment of the bids to assess their reasonableness.

189.   In November 2014, Defendants also were informed by USC's investment advisor, CAPTRUST Financial Advisors, that three of the four active recordkeepers charged *high* recordkeeping fees.  In particular, the Committee

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

minutes note that Fidelity and Vanguard charged fees at the "high end" of the benchmark range and Prudential's fees were "significantly higher" than the range.

190.   If Defendants had conducted a competitive bidding process for the Plans' recordkeeping services, and not allowed bundling of recordkeeping with the recordkeepers' investment products, the process would have resulted in very substantial reductions in the Plans' recordkeeping fees, totaling millions of dollars.

191.   Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendants also failed to negotiate rebates of all excessive fee payments to TIAA, Fidelity, Vanguard, and Prudential. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based fees as much smaller plans that used TIAA's products and services, Defendants could have demanded "plan pricing" rebates from TIAA based on the Plans' economies of scale. Just as with investment management fees, the Plans' size would have enabled Defendants to command a much lower fee. Defendants could have also demanded similar rebates from Vanguard, Fidelity, and Prudential. Had Defendants negotiated for the rebates of all excess compensation paid to the recordkeepers, the Plans' recordkeeping fees would have been substantially reduced, avoiding additional losses of Plan participants' retirement savings.

192.   Defendants also failed to control recordkeeping costs as Plan assets grew. From December 31, 2009 to December 31, 2014, the Plans' assets increased from $2.7 billion to over $4.6 billion, an increase of 70%. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendants could have capped the amount of revenue sharing to ensure that *all* excessive amounts above a reasonable recordkeeping fee were returned to the Plans as other plans do, but failed to do so.

193.   By failing to prudently monitor and control the Plans' recordkeeping

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

and administrative fees, particularly the asset-based revenue sharing received by TIAA, Vanguard, Fidelity, and Prudential, and maintaining an inefficient and costly structure of multiple recordkeepers, Defendants caused the Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services. Defendants' failure to ensure that participants only paid reasonable fees for administrative and recordkeeping services caused the Plans and their participants to lose over $45 million of their retirement savings.[55]

**IV. Defendants caused the Plans to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.**

194.   Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part

---

[55] The Plans' losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments, growing with the market.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

> of a prudent decision making process. The failure to
> understand the concepts and to know about the
> alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[56]

195.   Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost share class of the same fund is available, to avoid saddling the plan with unnecessary fees.

196.   Jumbo investors like the DC Plan and TDA Plan can obtain share classes with far lower costs than retail mutual fund shares. Lower-cost share classes of mutual fund investment options were readily available to the Plans. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform.

> For large 401(k) plans with over a billion dollars in total
> assets…mutual funds will often waive an investment
> minimum for institutional share classes. It is also common
> for investment advisors representing large 401(k) plans to
> call mutual funds and request waivers of the investment
> minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013).

197.   In fact, Vanguard expressly "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial

---

[56] http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

economies in the servicing of their accounts."[57]

198.   For Vanguard and TIAA-CREF mutual fund options, as further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plan less expensive institutional share classes for a particular mutual fund option despite that fund not meeting the minimum investment threshold.

199.   Therefore, Defendants knew or should have known that investment providers would have allowed the Plans to provide lower-cost institutional share classes to participants if Defendants had asked.

200.   Prudent fiduciaries do not solely rely on a recordkeeper to notify them regarding the availability of lower-cost share classes for their plan's mutual fund investments. However, until November 2014, Defendants blindly relied on the Plans' recordkeepers to notify the Committee regarding whether the Plans qualified for lower-cost share classes for the Plans' mutual funds.

201.   As explained in further detail below, *see supra* ¶230, USC hired CAPTRUST Financial Advisors in late 2014 to assist it when selecting and monitoring Plan investments. Prior to USC hiring this investment advisor, Defendants never conducted an independent investigation of available lower-cost share classes and never inquired into whether the Plans' mutual fund providers would waive any investment minimums for the lowest-cost institutional shares given the Plans' substantial bargaining power.

202.   Despite these far lower-cost options that were available to the Plans, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plans based on their size. Moreover, for

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

---

[57] *See* Vanguard Funds Multiple Class Plan,
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multiplec
lassplanvanguardfun.pdf.

the *exact same mutual fund option*, the Defendants selected and continue to offer for years much higher-cost share classes of identical mutual funds when the identical funds with a much lower cost share class were available to the Plans. The following table lists the significantly lower-cost, but otherwise identical share classes of funds that were available to the Plans since 2010 but were not used at certain times throughout the time in suit:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity China Region (FHKCX) | 101 bps | Fidelity China Region I (FHKIX) | 98 bps | 3.06% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond Instl (FCNVX) | 30 bps | 33.33% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 137 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) I (FIEMX) | 126 bps | 8.73% |
| Fidelity Global Commodity Stock (FFGCX) | 111 bps | Fidelity Global Commodity Stock I (FFGIX) | 106 bps | 4.72% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth Z (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 113 bps | Fidelity International Real Estate I (FIRIX) | 112 bps | 0.89% |
| Fidelity International Small Cap (FISMX) | 120 bps | Fidelity International Small Cap I (FIXIX) | 108 bps | 11.11% |
| Fidelity Japan (FJPNX) | 90 bps | Fidelity Japan I (FJPIX) | 89 bps | 1.12% |
| Fidelity Large Cap Growth (FSLGX) | 90 bps | Fidelity Large Cap Growth I (FLNOX) | 82 bps | 9.76% |
| Fidelity Latin America (FLATX) | 107 bps | Fidelity Latin America I (FLFIX) | 104 bps | 2.88% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock Z (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 79 bps | Fidelity Mid Cap Growth I (FGCOX) | 67 bps | 17.91% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Real Estate Income (FRIFX) | 83 bps | Fidelity Real Estate Income I (FRIRX) | 79 bps | 5.06% |
| Fidelity Select Gold (FSAGX) | 91 bps | Fidelity Select Gold I (FGDIX) | 84 bps | 8.33% |
| Fidelity Select Materials (FSDPX) | 82 bps | Fidelity Select Materials I (FMFEX) | 81 bps | 1.23% |
| Fidelity Small Cap Independence (FDSCX ) | 85 bps | Fidelity Small Cap Independence I (FCDIX) | 85 bps | 0.00% |
| Fidelity Spartan 500 Index Instl (FXSIX) | 4 bps | Fidelity Spartan 500 Index Instl Prem (FXAIX) | 2 bps | 100.00% |
| Fidelity Spartan Emerging Markets Index Adv (FPMAX) | 20 bps | Fidelity Spartan Emerging Markets Index Instl Prem (FPADX) | 10 bps | 100.00% |
| Fidelity Spartan Extended Market Index Adv (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index Instl Prem (FSMAX) | 6 bps | 16.67% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan Global ex-US Index Adv (FSGDX) | 18 bps | Fidelity Spartan Global ex-US Index Instl Prem (FSGGX) | 10 bps | 80.00% |
| Fidelity Spartan Inflation-Protected Index Adv (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index Instl Prem (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index Inv (FSIIX) | 10 bps | Fidelity Spartan International Index Instl Prem (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan International Index Instl (FSPNX) | 7 bps | Fidelity Spartan International Index Instl Prem (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan Mid Cap Index Adv (FSCKX) | 8 bps | Fidelity Spartan Mid Cap Index Instl Prem (FSMDX) | 4 bps | 100.00% |
| Fidelity Spartan Real Estate Index Adv (FSRVX) | 9 bps | Fidelity Spartan Real Estate Index Instl (FSRNX) | 7 bps | 28.57% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan Small Cap Index Adv (FSSVX) | 9 bps | Fidelity Spartan Small Cap Index Instl Prem (FSSNX) | 5 bps | 80.00% |
| Fidelity Spartan Total Market Index Inv (FSTMX) | 10 bps | Fidelity Spartan Total Market Index Instl Prem (FSKAX) | 5 bps | 40.00% |
| Fidelity Spartan Total Market Index Ins (FSKTX) | 6 bps | Fidelity Spartan Total Market Index Instl Prem (FSKAX) | 5 bps | 20.00% |
| Fidelity Spartan US Bond Index Instl (FXSTX) | 7 bps | Fidelity Spartan US Bond Index Instl Prem (FXNAX) | 5 bps | 40.00% |
| Fidelity Stock Selector Small Cap (FDSCX) | 72 bps | Fidelity Stock Selector Small Cap I (FCDIX) | 70 bps | 2.86% |
| Prudential American Funds Europacific Growth R3 (RERCX) | 114 bps | Prudential Amer:Europacific Growth R6 (RERGX) | 49 bps | 132.65% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential American Funds American Balanced R3 (RLBCX) | 94 bps | Prudential American Funds American Balanced R6 (RLBGX) | 29 bps | 224.14% |
| Prudential Columbia Seligman Communication & Income A (SLMCX) | 136 bps | Prudential Columbia Seligman Communication & Income I (CSFIX) | 97 bps | 40.21% |
| Prudential DWS Small Cap Value A (KDSAX) | 122 bps | Prudential DWS Small Cap Value Instl (KDSIX) | 82 bps | 48.78% |
| Prudential Global Real Estate Z (PURZX) | 96 bps | Prudential Global Real Estate Q (PGRQX) | 83 bps | 15.66% |
| Prudential Global Total Return Z (PZTRX) | 98 bps | Prudential Global Total Return Q (PGTQX) | 87 bps | 12.64% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential Goldman Sachs Mid Cap Value A (GCMAX) | 114 bps | Prudential Goldman Sachs Mid Cap Value Instl (GSMCX) | 74 bps | 54.05% |
| Prudential American Funds Growth Fund of America R3 (RGACX) | 98 bps | Prudential American Funds Growth Fund of America R6 (RGAGX) | 30 bps | 226.67% |
| Prudential INVESCO Small Cap Growth A (GTSAX) | 121 bps | Prudential INVESCO Small Cap Growth R6 (GTSFX) | 73 bps | 65.75% |
| Prudential Jennison Mid Cap Growth Z (PEGZX) | 77 bps | Prudential Jennison Mid Cap Growth Q (PJGQX) | 58 bps | 32.76% |
| Prudential Jennison Nat Resources Z (PNRZX) | 87 bps | Prudential Jennison Nat Resources Q (PJNQX) | 74 bps | 17.57% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential Jennison Value Z (PEIZX) | 79 bps | Prudential Jennison Value Q (PJVQX) | 63 bps | 25.40% |
| Prudential Legg Mason ClearBridge Small Cap Growth A (SASMX) | 124 bps | Prudential Legg Mason ClearBridge Small Cap Growth IS (LMOIX) | 78 bps | 58.97% |
| Prudential MFS Value A (MEIAX) | 92 bps | Prudential MFS Value R5 (MEIKX) | 53 bps | 73.58% |
| Prudential Oppenheimer Developing Markets A (ODMAX) | 130 bps | Prudential Oppenheimer Developing Markets I (ODVIX) | 85 bps | 52.94% |
| Prudential Oppenheimer Global Allocation A (QVGIX) | 127 bps | Prudential Oppenheimer Global Allocation I (QGRIX) | 87 bps | 45.98% |
| Prudential PIMCO Total Return A (PTTAX) | 85 bps | Prudential PIMCO Total Return Instl (PTTRX) | 46 bps | 84.78% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Prudential Stock Index Z (PSIFX) | 25 bps | Prudential Stock Index I (PDSIX) | 19 bps | 31.58% |
| Vanguard 500 Index Inv (VFINX) | 17 bps | Vanguard 500 Index Instl Plus (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation Inv (VAAPX) | 29 bps | Vanguard Asset Allocation Adm (VAARX) | 21 bps | 38.10% |
| Vanguard Balanced Index Inv  (VBINX) | 23 bps | Vanguard Balanced Index Instl (VBAIX) | 8 bps | 187.50% |
| Vanguard Capital Opportunity Inv (VHCOX) | 47 bps | Vanguard Capital Opportunity Adm (VHCAX) | 40 bps | 17.50% |
| Vanguard Developed Markets Index Inv (VDVIX) | 20 bps | Vanguard Developed Markets Index Instl (VTMNX) | 7 bps | 185.71% |
| Vanguard Developed Markets Index Inv (VDMIX) | 20 bps | Vanguard Developed Markets Index Instl Plus (VDMPX) | 6 bps | 233.33% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Dividend Appreciation Index Inv (VDAIX) | 20 bps | Vanguard Dividend Appreciation Index Adm (VDADX) | 10 bps | 100.00% |
| Vanguard Emerging Markets Stock Index Inv (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index Instl Plus (VEMRX) | 10 bps | 230.00% |
| Vanguard Energy Inv (VGENX) | 38 bps | Vanguard Energy Adm (VGELX) | 32 bps | 18.75% |
| Vanguard Equity-Income Inv (VEIPX) | 29 bps | Vanguard Equity-Income Adm (VEIRX) | 20 bps | 45.00% |
| Vanguard European Stock Index Inv (VEURX) | 26 bps | Vanguard European Stock Index Instl (VESIX) | 9 bps | 188.89% |
| Vanguard Explorer Inv (VEXPX) | 51 bps | Vanguard Explorer Adm (VEXRX) | 35 bps | 45.71% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Extended Market Index Inv (VEXMX) | 23 bps | Vanguard Extended Market Index Instl (VIEIX) | 6 bps | 283.33% |
| Vanguard FTSE All-World ex-US Index Inv (VFWIX) | 29 bps | Vanguard FTSE All-World ex-US Index Instl Plus (VFWPX) | 10 bps | 190.00% |
| Vanguard FTSE All-World ex-US Small-Cap Index Inv (VFSVX) | 37 bps | Vanguard FTSE All-World ex-US Small-Cap Index Instl (VFSNX) | 18 bps | 105.56% |
| Vanguard FTSE Social Index Inv (VFTSX) | 27 bps | Vanguard FTSE Social Index Instl (VFTNX) | 16 bps | 68.75% |
| Vanguard GNMA Inv (VFIIX) | 21 bps | Vanguard GNMA Adm (VFIJX) | 11 bps | 90.91% |
| Vanguard Growth & Income Inv (VQNPX) | 37 bps | Vanguard Growth & Income Adm (VGIAX) | 26 bps | 42.31% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Growth Index Inv (VIGRX) | 23 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | 187.50% |
| Vanguard Health Care Inv (VGHCX) | 35 bps | Vanguard Health Care Adm (VGHAX) | 30 bps | 16.67% |
| Vanguard High-Yield Corporate Inv (VWEHX) | 23 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | 76.92% |
| Vanguard Inflation-Protected Securities Inv (VIPSX) | 20 bps | Vanguard Inflation-Protected Securities Instl (VIPIX) | 7 bps | 185.71% |
| Vanguard Intermediate-Term Bond Index Inv (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index Instl Plus (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade Inv (VFICX) | 20 bps | Vanguard Intermediate-Term Investment-Grade Adm (VFIDX) | 10 bps | 100.00% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Intermediate-Term Treasury Inv (VFITX) | 20 bps | Vanguard Intermediate-Term Treasury Adm (VFIUX) | 10 bps | 100.00% |
| Vanguard International Growth Inv (VWIGX) | 47 bps | Vanguard International Growth Adm (VWILX) | 34 bps | 38.24% |
| Vanguard Large-Cap Index Inv (VLACX) | 23 bps | Vanguard Large-Cap Index Instl (VLISX) | 8 bps | 187.50% |
| Vanguard Long-Term Bond Index Inv (VBLTX) | 20 bps | Vanguard Long-Term Bond Index Instl Plus (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade Inv (VWESX) | 22 bps | Vanguard Long-Term Investment-Grade Adm (VWETX) | 12 bps | 83.33% |
| Vanguard Long-Term Treasury Inv (VUSTX) | 20 bps | Vanguard Long-Term Treasury Adm (VUSUX) | 10 bps | 100.00% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Mid Cap Index Inv (VIMSX) | 23 bps | Vanguard Mid Cap Index Instl Plus (VMCPX) | 6 bps | 283.33% |
| Vanguard Mid-Cap Growth Index Inv (VMGIX) | 23 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX) | 9 bps | 155.56% |
| Vanguard Mid-Cap Value Index Inv (VMVIX) | 23 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 9 bps | 155.56% |
| Vanguard Morgan Growth Inv (VMRGX) | 40 bps | Vanguard Morgan Growth Adm (VMRAX) | 26 bps | 53.85% |
| Vanguard Pacific Stock Index Inv (VPACX) | 26 bps | Vanguard Pacific Stock Index Instl (VPKIX) | 9 bps | 188.89% |
| Vanguard Prime Money Market Inv (VMMXX) | 14 bps | Vanguard Prime Money Market Adm (VMRXX) | 10 bps | 40.00% |
| Vanguard PRIMECAP Inv (VPMCX) | 44 bps | Vanguard PRIMECAP Adm (VPMAX) | 35 bps | 25.71% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard REIT Index Inv (VGSIX) | 24 bps | Vanguard REIT Index Instl (VGSNX) | 8 bps | 200.00% |
| Vanguard Short-Term Bond Index Inv (VBISX) | 20 bps | Vanguard Short-Term Bond Index Instl (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal Inv (VSGBX) | 20 bps | Vanguard Short-Term Federal Adm (VSGDX) | 10 bps | 100.00% |
| Vanguard Short-Term Investment-Grade Inv (VFSTX) | 20 bps | Vanguard Short-Term Investment-Grade Instl (VFSIX) | 7 bps | 185.71% |
| Vanguard Short-Term Treasury Inv (VFISX) | 20 bps | Vanguard Short-Term Treasury Adm (VFIRX) | 10 bps | 100.00% |
| Vanguard Small Cap Growth Index Inv (VISGX) | 23 bps | Vanguard Small Cap Growth Index Instl (VSGIX) | 8 bps | 187.50% |
| Vanguard Small Cap Index Inv (NAESX) | 23 bps | Vanguard Small Cap Index Instl Plus (VSCPX) | 6 bps | 283.33% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Value Index Inv (VISVX) | 23 bps | Vanguard Small Cap Value Index Instl (VSIIX) | 8 bps | 187.50% |
| Vanguard Total Bond Market Index Inv (VBMFX) | 20 bps | Vanguard Total Bond Market Index Instl (VBMPX) | 5 bps | 300.00% |
| Vanguard Total International Stock Index Inv (VGTSX) | 22 bps | Vanguard Total International Stock Index Instl Plus (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index Inv (VTSMX) | 17 bps | Vanguard Total Stock Market Index Instl Plus (VITPX) | 2 bps | 750.00% |
| Vanguard Total World Stock Index Inv (VTWSX) | 27 bps | Vanguard Total World Stock Index Instl Plus  (VTWIX) | 15 bps | 80.00% |
| Vanguard U.S. Growth Inv (VWUSX) | 44 bps | Vanguard U.S. Growth Adm (VWUAX) | 30 bps | 46.67% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Value Index Inv (VIVAX) | 23 bps | Vanguard Value Index Instl (VIVIX) | 8 bps | 187.50% |
| Vanguard Wellesley Income Inv (VWINX) | 25 bps | Vanguard Wellesley Income Adm (VWIAX) | 18 bps | 38.89% |
| Vanguard Wellington Inv (VWELX) | 26 bps | Vanguard Wellington Adm (VWENX) | 18 bps | 44.44% |
| Vanguard Windsor II Inv (VWNFX) | 36 bps | Vanguard Windsor II Adm (VWNAX) | 28 bps | 28.57% |
| Vanguard Windsor Inv (VWNDX) | 38 bps | Vanguard Windsor Adm (VWNEX) | 28 bps | 35.71% |

203.   These lower-cost share classes of the identical mutual funds for the Plans have been available for years, some dating back to the early 2000's or before.

204.   The failure to select far lower-cost share classes for the Plans' mutual fund options that are *identical in all respects* (portfolio manager, underlying investments, and asset allocation), *except for cost*, demonstrates that Defendants failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

205.   Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share classes, the Plans' participants

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

would not have lost millions of dollars of their retirement savings.

**V.     Defendants maintained duplicative and overlapping investment options in the Plans, which Defendants did not and could not appropriately monitor because of their overwhelming number.**

206.   Until the Plans' new investment lineup was implemented in 2016, Defendants maintained over *350* investments in the investment lineup for the following asset classes: balanced/asset allocation (24 options), fixed income and high yield bond (52 options), international (55 options), mid cap domestic equities (31 options), small cap domestic equities (18 options), real estate (7 options), money market (12 options), and target date investments (3 fund families).

207.   When developing and maintaining an investment lineup for defined contribution plans, prudent fiduciaries do not maintain duplicative and overlapping investment options in their plans. Rather, they create a balanced well-diversified lineup from which the participants can invest their retirement assets. Prudent fiduciaries offer a streamlined investment lineup of "best-in-class" investment options with coverage over major asset classes, including domestic equity, international equity, fixed income, and target date or asset allocation funds. *See supra* ¶¶124–139. Moreover, in building an investment lineup, USC's investment advisor advised the Committee to offer one option per asset class.

208.   In comparison to the Plans' prior investment lineup, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average of *15* investment options, excluding target date funds.[58] USC's own investment advisor advised the Committee in February 2015 to offer no more than 30 options. It noted that the standard industry practice was between 11 and 20 options. This number of options provides choice of

---

[58] Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015), https://www.callan.com/research/files/990.pdf.

investment style to participants while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and obtaining lower fees, and avoiding participant confusion and obtaining lower fees.

209.   Fund decisions must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§ 2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. This removes the benefit of pooling assets consistent with the size of the Plans. Assembling a haphazard lineup of over *340* duplicative options, 96% of which are proprietary to the Plans' recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection and evaluation process.

210.   Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select (or maintain) a prudent investment option. In contrast to Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When a plan includes many investment options in a single investment style, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

211.   Prudent fiduciaries develop investment policies, guidelines, and other objective criteria to guide the selection, monitoring, and retention of investment options. They eliminate any investment option that does not meet their objective criteria for inclusion or retention in their approved investment lineup. In contrast, Defendants did not develop an investment policy statement to guide their selection, monitoring, and retention of investment options until February 2015. Prior to that

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

date, Defendants never applied objective qualitative and quantitative criteria to their investment decisions in order to ensure that only prudent investments were offered to Plan participants. Before 2016, they never made a decision to remove any investment option in the Plans regardless of whether it suffered from sustained and consistent underperformance relative to its benchmark index.

212. Maintaining hundreds of investment options harmed Plan participants. This investment structure deprived the Plans of their bargaining power associated with offering a single fund in each investment style that significantly reduces investment fees, and leading to what industry experts have described as "decision paralysis" for participants. *See, e.g.,* Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").

213. A larger pool of assets in each investment style significantly reduces fees paid by participants. Reducing the number of investment options in a particular investment category allows a plan to qualify for lower-cost institutional class shares of the same investment options, which provides for greater retirement savings for participants. In fact, on December 9, 2011, Fidelity specifically informed the Committee that the fees charged to the Plans would be reduced if the Plans' investment lineup was reduced. However, neither the Committee nor USC took any action at that time to reduce the Plans' investments to obtain these recognized fee savings.

214. Prudent fiduciaries also do not maintain "sector" funds in their plan's investment lineup for plan participants to build their retirement portfolios. Sector funds are narrowly concentrated in a specific sector (*e.g.,* natural resources and precious metals). These funds are not provided to plan participants because these investments have too much concentrated risk for a retirement plan due to their lack

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

of diversification and extreme volatility.

215.   Despite the actions of prudent fiduciaries, Defendants maintained sector funds, such as the Fidelity Select Funds and several Vanguard sector funds, in the Plans until 2016. A prudent fiduciary would have removed these funds by August 2010, if not by 2009, based on the characteristics of the Plans. When these funds were actually evaluated for retention in the Plans, USC's investment advisor recommended their removal because they were not appropriate for the "best-in-class" investment menu based on the standards set forth in the Plans' investment policy statement. *See infra* ¶¶235–236.

216.   Defendants also failed to make a reasoned decision that each of the Plans' hundreds of investment options was prudent and should be maintained in the Plans based on objective criteria, such as investment performance, peer rankings, and expenses.

217.   Prior to the Plans' new investment structure, Defendants took no action to determine that the dramatically higher fees charged by the Plans' active managers were justified based on their historical performance. In fact, before 2015, the Committee purportedly tasked with reviewing the Plans' investment options did not hold regular meetings to monitor these options. From 2010 through 2012, the Committee only met in December of the calendar year to hold annual reviews with the Plans' recordkeepers and without the assistance of a professional investment advisor. The Committee minutes and meeting materials that Defendants have produced in this case so far do not show that USC or the Committee took any action prior to the annual meetings to review the Plans' investment options or the expenses charged to Plan participants or remove any investment options that were underperforming. In fact, those minutes and materials show that the Committee did not even meet to discuss issues associated with the Plans from January 2013 through October 2014. Defendants have not produced any documents that even suggest that anyone at USC was monitoring the investments and expenses in the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Plans in that period.

218.   Because Defendants maintained over 350 investment options in the Plans, Defendants did not and could not prudently monitor each and every investment option provided in the Plans. The Committee minutes and materials confirm that Defendants were unable to prudently monitor each of the Plans' investment options, particularly when they maintained Plan investments that consistently and historically underperformed their respective benchmarks. *See infra* ¶¶248. Prudent fiduciaries recognize that an investment lineup with hundreds of funds cannot be prudently and effectively monitored without enormous time being spent to carry out their fiduciary obligations.

219.   In contrast to Defendants' actions, prudent fiduciaries monitor the Plans' investments at least on a quarterly basis. This is the recognized prudent practice among fiduciaries for defined contribution plans.[59] Regular and consistent monitoring of an investment option is necessary to ensure that the option continues to be a prudent investment for the plan, which includes an evaluation of the performance compared to its benchmark index and peer group, an assessment that the fund continues to perform in line with its investment objective, confirmation that no organizational changes have occurred that affects the fund's ability to generate excess returns, and an evaluation that current market conditions have not adversely affected the fund and its ability to meet the plan's investment policy with respect to that asset class or investment style.

220.   In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup, and leads to decision

---

[59] Robert E. Jamison, *Share the Love; Establish an Investment Committee*, p. 3, https://www.fi360.com/main/pdf/jamison110807.pdf; Vanguard, *Best Practices for Plan Fiduciaries*, p. 14, https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf, ("Frequency of meetings is important" and "A good discipline is to meet quarterly.").

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

paralysis. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009)("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[60]

221. USC itself admitted that participants were "[o]verwhelmed by over 350 current fund choices" when it very belatedly reduced the Plans' options in 2016.[61] This was after USC's investment advisor informed the Committee in February 2015 of "choice overload", which means that "more options participants have to choose form the more likely they are to become overwhelmed and moved towards inaction lowering participation".

222. For illustration purposes, the Plans' approximately 16 large cap domestic blend investments as of December 31, 2014 are summarized below and compared to a single lower-cost alternative available to the Plans: the Vanguard Institutional Index Fund Institutional Plus Shares (VIIIX), which mirrors the market and has an expense ratio of 2 bps. The DC Plan's assets are noted in this example.

| Large Cap Blend Investment | Assets | Fee | Institutional Index Fund (VIIIX) | Plans' Excess Cost |
|---|---|---|---|---|
| CREF Equity Index Account | $45,696,150 | 37 bps | 2 bps | 1750% |

---

[60] http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.
[61] University of Southern California, *Changes to USC Retirement Plans 2016 Webcast* (Feb. 2016), https://www.youtube.com/watch?v=NEYlf7nwfJg.

| | | | | |
|---|---|---|---|---|
| CREF Stock Account | $242,459,930 | 46 bps | 2 bps | 2200% |
| Fidelity Disciplined Equity (K) (FDEKX) | $1,463,260 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income (K) (FGIKX) | $10,197,038 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index (FLCEX) | $209,186 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock  (FLCSX) | $908,109 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock  (FGRTX) | $1,536,892 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index (Instl) (FXSIX) | $18,588,698 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index (Instl) (FSKTX) | $5,797,878 | 5 bps | 2 bps | 150% |
| Prudential Stock Index (Z) (PSIFX) | $2,870,553 | 25 bps | 2 bps | 1150% |
| Vanguard 500 Index (Inv) (VFINX) | $16,886,278 | 17 bps | 2 bps | 750% |
| Vanguard Growth & Income (Inv) (VQNPX) | $1,454,767 | 37 bps | 2 bps | 1750% |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| | | | | |
|---|---|---|---|---|
| Vanguard Large-Cap Index (Inv) (VLACX) | $349,936 | 23 bps | 2 bps | 1050% |
| Vanguard PRIMECAP Core (Inv) (VPCCX) | $1,881,908 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | $13,474,198 | 17 bps | 2 bps | 750% |
| **DC Plan Total Assets** | $363,809,716 | | | |

223.   With over *$640 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive, respectively, than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively. Moreover, the CREF Stock Account has also been recommended for removal from defined contribution plans by an independent consultant, *see infra* ¶279.



SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

224.   Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. If those investments were consolidated into a single investment for the large cap domestic blend asset category, the Plans would have saved millions of dollars in investment management expenses. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (VIIIX), the Plans' participants would have avoided losing millions in fees for 2014 alone, and many more millions since 2010 to the present and continuing into the future.

225.   In addition, Defendants even selected and continue to retain multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to hold and generate investment returns in excess of its benchmark, passively managed index funds hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower, as set forth *supra*, ¶¶75–84.

226.   For example, in the large cap blend investment style, Defendants provided at least *seven* index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

227.   Since index funds merely hold the same securities in the same proportions as the index, having multiple index funds of the same category or investment style in the Plans provides no benefit to participants. *Cf.* Lewis Braham, *Indexing Just Got Cheaper*, BARRON'S (November 7, 2016)(*quoting* Morningstar

CEO, Joe Mansueto, for the principle that "[b]asic market indexes are virtually interchangeable.").[62] Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the size of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

228.   Had Defendants combined Plan assets of duplicative index funds into a single index fund, the Plans would have obtained lower fees and generated higher returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

229.   As a result of maintaining over 350 funds in the Plans, Defendants failed to prudently monitor the funds in the Plans. The Committee minutes and meeting materials do not demonstrate that Defendants took the time to even read the prospectuses for the funds they maintained in the Plans, which alone would have taken days. In addition, it would have taken substantially more time to monitor the funds' individual fees and performance histories, monitor manager track records, and monitor changes in the fund managers in comparison to a streamlined investment lineup. Defendants did not devote the necessary time and resources to satisfy their fiduciary obligations and prudently monitor each and every investment option in the Plans.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

---

[62] http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

**VI.    A prudent and loyal fiduciary would have implemented a streamlined investment lineup by August 2010, as shown by Defendants' actions when they finally evaluated the Plans' investment options for retention through the assistance of a professional investment advisor.**

230.   Neither USC nor the Committee engaged a professional investment advisor to assist them in overseeing the Plans' investments and administrative expenses until October 2014, when USC finally engaged CAPTRUST Financial Advisors ("CAPTRUST") to provide advice regarding the administration of the Plans. USC hired CAPTRUST to make recommendations on the development of an investment policy statement, recommendations for selecting and monitoring Plan investments, and providing periodic performance reports of the Plans' investments. That was despite the fact that the Committee acknowledged in December 2011 the "benefit from restructuring plan options." The documents that Defendants have produced to date, including minutes and meeting materials of the Committee, do not show that either the Committee or USC did anything about that from December 2011 until October 2014.

231.   Through the process that led to the implementation of the Plans' new investment structure in 2016, CAPTRUST made recommendations to the Committee regarding building a streamlined Plan investment lineup. CAPTRUST recommended to "[m]aintain a diverse but reasonable number of core menu options". CAPTRUST advised that "[e]ach option within the portfolio should have a specific role and little overlap with other choices". It noted that research indicates "choice overload", which "suggests that more options participants have to choose form the more likely they are to become overwhelmed and moved towards inaction lowering participation". As a result, it advised the Committee to offer "one option per asset class" and no more than 30 options. It noted that the standard industry practice was between 11 and 20 options.

232.   In addition, CAPTRUST recommended a menu comprised of four

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

tiers: Tier 1 - asset allocation funds (or target date funds); Tier 2 - actively managed funds for the major asset classes; Tier 3 - passively managed funds for major asset classes; and Tier 4 - a self-directed brokerage account.

233.   These recommendations were well-recognized among investment professionals before August 2010 as the standard industry practice. USC would have received the same advice before 2010, such that it could have streamlined the Plans in this manner by August 2010.

234.   In light of a prudent plan design, prudent fiduciaries do not maintain more than one target date fund series. There is also no prudent reason to do so. Defendants recognized this when they removed Fidelity's and TIAA's target date funds from the Plans in 2016 in favor of a single target date fund series offered by Vanguard.

235.   After Defendants decided to maintain TIAA, Fidelity, and Vanguard as recordkeepers, CAPTRUST then recommended specific funds to be offered in each tier by provider. CAPTRUST recommended that the vast majority of the investment options offered by the Plans' recordkeepers should be removed because they were inappropriate. Among the 189 funds offered on Fidelity's platform, CAPTRUST recommended that 92% (or 173) of them be removed. For the 87 Vanguard funds, CAPTRUST recommended 77% (or 67) of the funds be removed. For the 30 TIAA-offered funds in the DC Plan, CAPTRUST recommended that 25% (or 8) of the funds be removed and freeze five of them (e.g., the CREF Bond, CREF Equity Index, CREF Global Equities, CREF Growth, and CREF Inflation-Linked Bond). It made the same recommendations for the 32 TIAA-offered funds in the TDA Plan. And for the 34 Prudential funds, CAPTRUST recommended the removal of 68% (or 23) of the funds be removed. In total, 271 of the 342 funds for the DC Plan (or 340 funds for the TDA) were recommended to be removed and 9 funds were recommended to be frozen.

236.   Among the 271 funds recommended for removal were the

undiversified and risky sector funds, including the Fidelity Select Funds, Vanguard Precious Metals and Mining Fund, the Vanguard Pacific Stock Index Fund, Vanguard Health Care Fund, and Vanguard Energy Fund. These funds were removed because they did not meet the investment policy and goals of the Plans.

237. Before hiring CAPTRUST, USC never conducted a similar analysis of the Plans and Plan investment options. A prudent fiduciary would have conducted such analysis of the Plans' investments by at least 2009. Had Defendants done so, they would have reached the same conclusion as they did with the Plans' new investment structure in 2016 and consolidated the Plans' investments. They would have implemented a streamlined menu of core options by August 2010 and eliminated at least the 271 funds, as recommended by CAPTRUST, from the Plans and mapped their assets to an approved investment lineup.

238. Taking this prudent action would have saved Plan participants millions of dollars of their retirement savings. Had Defendants removed those 271 funds from the Plan by August 2010 and mapped their assets to the corresponding investment in the same or similar asset class offered in the Plans' new investment lineup implemented, Plan participants would not have lost in excess of $146 million.

239. In the alternative, had Defendants mapped the removed funds to passively managed Vanguard alternatives in the same or similar asset classes, Plan participants would not have lost in excess of $135 million. Passively managed Vanguard alternatives are an appropriate proxy to the returns Plan participants could have achieved if their retirement assets were invested in the same or similar asset classes.[63]

**VII. Defendants have admitted that the Plans' prior structure was imprudent**

---

[63] The Plan's losses have been brought forward to the present value using the investment returns of the alternative replacement fund.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

**and caused unreasonable fees to be charged to the Plans.**

240.   Defendants expressly acknowledged that the Plans' multiple recordkeeper structure and *hundreds* of investment options caused the Plans to pay unreasonable recordkeeping and investment fees.

241.   In a November 4, 2015 presentation to the Academic Senate Environment Committee & Staff Assembly Benefits Committee, USC admitted that the new investment structure was designed to "[s]implify your investment choices", "[e]ncourage better decision making", and "lower costs". The changes were made to "[l]everage the assets in the USC plan to obtain lower cost investment options" and "[o]ffer the best in class investment options", among other guiding principles.

242.   The presentation also noted that participants are "overwhelmed by the over 350 choices available to them".  In addition, it stated that the funds selected for the new investment lineup "have been judged as best-in-class in terms of expected performance & fees" and will be "actively monitored".

243.   In a January 27, 2016 Plan communication notifying participants of the March 2016 changes, USC stated:

> These changes are designed to **simplify your investment choices** for retirement savings, encourage better decision making **and lower costs**. Highlights of the changes include a fund menu with a suite of target date retirement funds and 34 **best-in-class funds** available through three investment providers (Fidelity, TIAA-CREF and Vanguard), **lower cost share classes whenever possible**, and a self-directed brokerage window.[64]

244.   In doing so, though the Plans should never have had that number of

---

[64] Michael W. Quick to USC Retirement Plan Participants, *USC Retirement Plan Changes,* Jan. 27, 2016. (emphasis added).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

options, it is telling that USC admitted that the changes were made to "[m]eet

fiduciary obligations." *See infra* ¶247.

245.   In the Transition Guide, USC further recognized the benefits of the

consolidated investment lineup.

- A new streamlined investment lineup
- 1 suite of target date retirement funds.
- 34 mutual funds and annuity contracts.
- **Lower administrative costs.**
- **Lower-cost share classes whenever possible.**[65]

246.   Debra Fabanish, the Director of USC's Retirement Plan

Administration and *Committee member* since 2014, described the changes made to

the Plans and directly admitted that the prior Plan structure with hundreds of funds

led to higher fees and decision paralysis by Plan participants. She offered no

explanation for why the prior structure was used or why these actions were not

taken years earlier. There is no justification for the failure to do so.

**What?**

Effective March 1, the University will implement a set of

changes to the USC retirement plans designed to:

- **Simplify your investment choices for retirement**.
- Encourage better decision making.
- **Lower expenses**.

**Why?**

Many participants opt out of active decision making:

- **Overwhelmed by over 350 current fund choices**.

---

[65] University of Southern California, *USC Retirement Plans Transition Guide*, at
2–3. (emphasis added).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

- Default rate amount <u>newly eligible</u> employees is almost 50%.
- Current default provider is designed for a more engaged participant.[66]

247.    Moreover, Ms. Fabanish specifically noted the USC's "Guiding Principles & Goals" in support of the Plan changes, which included meeting its "fiduciary obligations" and lowering investment expenses by "leveraging" Plan assets. In their entirety, these principles included:

**Guiding Principles & Goals**

- **Simplify the participant experience in selecting investments**.
- **Meet fiduciary obligations**.
- **Leverage the assets in the USC plans to obtain lower cost investment options.**
- Maintain existing relationships with investment providers (Fidelity, TIAA-CREF and Vanguard).
- **Offer the choice of low cost investment options.**
- **Offer the choice of best-in-class investment options**.
- Provide a self-directed brokerage account for sophisticated participants who want more investment options.
- Minimize unnecessary disruption.[67]

---

[66] University of Southern California, *Changes to USC Retirement Plans 2016 Webcast* (Feb. 2016)(bold emphasis added), https://www.youtube.com/watch?v=NEYlf7nwfJg.
[67] Changes to USC Retirement Plans 2016 Webcast (emphasis added).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

## VIII.   Defendants disloyally and imprudently retained historically underperforming Plan investments.

248.   The excessive fees in the Plans' investments were not justified by superior investment returns. Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plans' investments resulted in options being retained in the Plans despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plans compared to what those assets would have earned if invested in prudent alternatives.

### A.   Defendants took no action to remove historically underperforming funds.

249.   Defendants were repeatedly informed that actively managed investment options in the Plans underperformed their respective benchmarks over 3- and/or 5-year periods. Despite being presented with this data, Defendants took no action to remove the funds. Indeed, the Plans' recordkeepers recommended the removal of certain investment options due to underperformance but the Committee took no action.

250.   Despite knowledge of consistently underperforming investments, the Committee provided no justification or reasons for maintaining funds that failed to outperform their respective benchmarks. Before the Plans' new investment structure was implemented in 2016, the Committee never recommended removing a single investment option from the Plans based on its consistent and sustained underperformance. Likewise, it never made a reasoned decision to retain an underperforming Plan investment.

251.   The sustained and consistent underperformance of Plan investment options that were retained in the Plans was shown as of the start of the limitations period, if not earlier. The earliest performance reports that Defendants have produced in this case report performance as of June 30, 2010. As of that date,

among the actively managed funds offered by Vanguard and TIAA that
underperformed their respective benchmarks included:

| Fund Name | Period |
|---|---|
| American Funds Washington Mutual | 3 and 5 Years |
| CREF Stock Account | 3 and 5 years |
| CREF Global Equities | 3 and 5 Years |
| CREF Growth Account | 3 and 5 years |
| CREF Inflation-Linked Bond Account | 3 and 5 years |
| TIAA-CREF Mid-Cap Growth Fund | 3 and 5 years |
| TIAA-CREF Small-Cap Equity Fund | 3 and 5 years |
| TIAA-CREF Mid-Cap Value Fund | 3 years |
| CREF Global Equities Account | 3 and 5 years |
| Vanguard U.S. Growth Fund | 3 and 5 years |
| Vanguard LifeStrategy Income Fund | 3 and 5 years |
| Vanguard LifeStrategy Conservative Growth Fund | 3 and 5 years |
| Vanguard LifeStrategy Moderate Growth Fund | 3 and 5 years |
| Vanguard LifeStrategy Growth Fund | 3 and 5 years |

252.   Similarly, actively managed Fidelity mutual funds that
underperformed their respective benchmarks included without limitation the
following funds:[68]

| Fund Name | Period |
|---|---|
| Fidelity Asset Manager 20% | 3 and 5 years |
| Fidelity Blue Chip Value | 3 and 5 years |
| Fidelity Disciplined Equity | 3 and 5 years |

[68] Historical performance data obtained from Morningstar. The corresponding
data presented by Fidelity to the Committee has not been produced by Defendants.
They also have not produced corresponding performance data for Prudential funds.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Period |
|-----------|--------|
| Fidelity Emerging Asia | 3 and 5 years |
| Fidelity Equity Income II | 3 and 5 years |
| Fidelity Equity-Income | 3 and 5 years |
| Fidelity Floating Rate High Income | 3 and 5 years |
| Fidelity Freedom 2000 | 3 and 5 years |
| Fidelity Freedom 2005 | 3 and 5 years |
| Fidelity Freedom 2010 | 3 and 5 years |
| Fidelity Freedom Income | 3 and 5 years |
| Fidelity GNMA | 5 years |
| Fidelity Growth & Income | 3 and 5 years |
| Fidelity Growth Strategies | 3 and 5 years |
| Fidelity Inflation Protected Bond | 3 and 5 years |
| Fidelity Institutional Short-Intermediate Government | 3 and 5 years |
| Fidelity Intermediate Bond | 3 and 5 years |
| Fidelity International Real Estate | 3 and 5 years |
| Fidelity Japan | 3 and 5 years |
| Fidelity Large Cap Growth | 3 and 5 years |
| Fidelity Latin America | 3 and 5 years |
| Fidelity Leveraged Company Stock | 3 years |
| Fidelity Magellan | 3 and 5 years |
| Fidelity Mid-Cap Growth | 3 and 5 years |
| Fidelity Mid-Cap Stock | 3 and 5 years |
| Fidelity Select Automotive | 3 years |
| Fidelity Select Banking | 3 and 5 years |
| Fidelity Select Brokerage & Investment | 3 years |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Period |
|---|---|
| Management | |
| Fidelity Select Construction and Housing | 3 and 5 years |
| Fidelity Select Consumer Finance | 3 and 5 years |
| Fidelity Select Energy | 3 years |
| Fidelity Select Energy Services | 3 years |
| Fidelity Select Financial Services | 3 and 5 years |
| Fidelity Select Insurance | 3 and 5 years |
| Fidelity Select Natural Gas | 3 years |
| Fidelity Select Telecommunications | 3 years |
| Fidelity Short Term Bond | 3 and 5 years |
| Fidelity Small Cap Independence | 3 and 5 years |
| Fidelity Stock  Selector All Cap | 3 and 5 years |
| Fidelity Stock  Selector Large Cap Value | 3 and 5 years |
| Fidelity Stock  Selector Mid Cap | 3 and 5 years |
| Fidelity Strategic Real Return | 3 years |
| Fidelity Telecom & Utilities | 3 years |
| Fidelity Ultra-Short Bond | 3 and 5 years |
| Fidelity Value | 3 and 5 years |
| Fidelity Value Discovery | 3 years |
| Fidelity Value Strategies | 3 and 5 years |

253.    The Committee also was presented with comparative data on the Plans' target date funds. The data showed that the Fidelity Freedom Funds consistently underperformed the Plans' lower-cost Vanguard Target Retirement target date funds and the TIAA-CREF Lifecycle target date funds over the prior 3-year period ending June 30, 2010. The Committee made no reasoned decision to maintain these higher-cost and lower performing Fidelity Freedom Funds in

comparison to the Plans' other target date fund options.

254.   The Committee was similarly presented performance data as of September 30, 2010 that demonstrated numerous actively managed funds that underperformed their respective benchmarks. In fact, TIAA informed the Committee that the relative performance for the quarter ending was "poor".

255.   A prudent fiduciary for a defined contribution plan would remove actively managed funds once the funds fail to outperform their respective benchmarks over the prior 3-year period. Prudent fiduciaries take this action because if a fund underperforms its respective benchmark for the trailing 3-year period, then it is highly unlikely it will outperform in the coming years. Morningstar, a leading provider of investment research and investment management services has confirmed these findings. After evaluating 3,478 fund replacements in defined contribution plans, Morningstar concluded that there is "significant evidence that the replacement fund outperforms the replaced fund over future one-year and three-year periods."[69]

256.   Defendants' failure to remove underperforming funds caused substantial losses to the Plans. There were numerous better performing and lower-cost investment alternatives that were available to the Plans, that if selected to replace the Plans' underperforming funds, would have avoided substantial losses incurred by the Plans.

257.   For example, had Defendants removed the underperforming actively managed funds identified above as of August 2010 and mapped their assets to the corresponding funds in the same or similar asset classes that were later approved for the Plans' new investment structure, Plan participants would not have lost in excess of $76 million of their retirement savings. In the alternative, had Defendants

---

[69] David Blanchett, Michael Finke, and Jim Licato, *Change in a Great Thing*, MORNINGSTAR, Apr. 15, 2019, https://www.napa-net.org/sites/napa-net.org/files/wp_Change_Is_Great-Blanchett-1.pdf.

mapped those underperforming funds to passively managed Vanguard alternatives in the same or similar asset classes, Plan participants would not have lost in excess of $226 million.[70]

## B. Prior to the implementation of the Plans' new investment structure, well over 100 of the Plans' investment options underperformed over the prior 5-year period.

258.   As further evidence of Defendants' imprudence in maintaining underperforming funds, as of September 30, 2015, 162 of the 369 investment options in the Plans—44% of the Plans' investment options—underperformed their respective benchmarks over the previous 5-year period.[71] These underperforming funds include the following:

| Fund Name | Ticker |
|-----------|--------|
| AIG SunAmerica Life Assurance Company Aggressive Growth Annuity | N/A |
| AIG SunAmerica Life Assurance Company  Asset Allocation Annuity | N/A |
| AIG SunAmerica Life Assurance Company Corporate Bond Annuity | N/A |
| AIG SunAmerica Life Assurance Company Emerging Markets Annuity | N/A |
| AIG SunAmerica Life Assurance Company Equity Index Annuity | N/A |
| AIG SunAmerica Life Assurance Company Fundamental Growth Annuity | N/A |

[70] The Plan's losses have been brought forward to the present value using the investment returns of the alternative replacement fund.

[71] These results are based on the performance and benchmark for each fund as shown on the December 1, 2015 Plan and Investment Notice issued to participants, https://www.tiaa.org/public/pdf/obiee/101192_Plan_Investment_Notice.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|---|---|
| AIG SunAmerica Life Assurance Company Global Equities Annuity | N/A |
| AIG SunAmerica Life Assurance Company Government and Quality Bond Annuity | N/A |
| AIG SunAmerica Life Assurance Company High Yield Bond Annuity | N/A |
| AIG SunAmerica Life Assurance Company International Diversified Equities Annuity | N/A |
| AIG SunAmerica Life Assurance Company Putnam Growth Annuity | N/A |
| AIG SunAmerica Life Assurance Company Real Estate Annuity | N/A |
| AIG SunAmerica Life Assurance Company Small Company Value Annuity | N/A |
| AIG SunAmerica Life Assurance Company Telecom Utility Annuity | N/A |
| CREF Bond Market | QCBMRX |
| CREF Equity Index | QCEQRX |
| CREF Inflation-Linked Bond | QCILRX |
| CREF Money Market | QCMMRX |
| CREF Social Choice | QCSCRX |
| CREF Stock | QCSTRX |
| Fidelity Asset Manager 60% | FSANX |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|---|---|
| Fidelity Balanced K | FBAKX |
| Fidelity Convertible Securities | FCVSX |
| Fidelity Disciplined Equity K | FDEKX |
| Fidelity Dividend Growth K | FDGKX |
| Fidelity Equity Income II K | FETKX |
| Fidelity Equity-Income K | FEIKX |
| Fidelity Export & Multinational K | FEXKX |
| Fidelity Floating Rate High Income | FFRHX |
| Fidelity Focused High Income | FHIFX |
| Fidelity Four in One Index | FFNOX |
| Fidelity Freedom K 2020 | FFKDX |
| Fidelity Freedom K 2025 | FKTWX |
| Fidelity Freedom K 2030 | FFKEX |
| Fidelity Freedom K 2035 | FKTHX |
| Fidelity Freedom K 2040 | FFKFX |
| Fidelity Freedom K 2045 | FFKGX |
| Fidelity Freedom K 2050 | FFKHX |
| Fidelity Fund K | FFDKX |
| Fidelity Global Balanced | FGBLX |
| Fidelity Global Commodity Stock | FFGCX |
| Fidelity Global Strategies | FDYSX |
| Fidelity Government Money Market | SPAXX |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|---|---|
| Fidelity High Income | SPHIX |
| Fidelity Independence K | FDFKX |
| Fidelity Inflation Protected Bond | FINPX |
| Fidelity Intermediate Government Income | FSTGX |
| Fidelity Japan | FJPNX |
| Fidelity Latin America | FLATX |
| Fidelity Limited Term Government | FFXSX |
| Fidelity Magellan K | FMGKX |
| Fidelity Money Market | SPRXX |
| Fidelity Money Market Trust Retirement Government Money Market Portfolio | FGMXX |
| Fidelity NASDAQ Composite Index | FNCMX |
| Fidelity New Markets Income | FNMIX |
| Fidelity New Millennium | FMILX |
| Fidelity Puritan K | FPUKX |
| Fidelity Real Estate Income | FRIFX |
| Fidelity Real Estate Investment  Portfolio | FRESX |
| Fidelity Retirement Money Market | FRTXX |
| Fidelity Select Automotive | FSAVX |
| Fidelity Select Banking | FSRBX |
| Fidelity Select Brokerage & Investment Management | FSLBX |
| Fidelity Select Chemicals | FSCHX |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|---|---|
| Fidelity Select Communications Equipment | FSDCX |
| Fidelity Select Computers | FDCPX |
| Fidelity Select Consumer Staples | FDFAX |
| Fidelity Select Energy | FSENX |
| Fidelity Select Energy Services | FSESX |
| Fidelity Select Environment and Alternative Energy | FSLEX |
| Fidelity Select Financial Services | FIDSX |
| Fidelity Select Gold | FSAGX |
| Fidelity Select Industrial Equipment | FSCGX |
| Fidelity Select Industrials | FCYIX |
| Fidelity Select Materials | FSDPX |
| Fidelity Select Money Market | FSLXX |
| Fidelity Select Natural Gas | FSNGX |
| Fidelity Select Natural Resources | FNARX |
| Fidelity Select Technology | FSPTX |
| Fidelity Select Telecommunications | FSTCX |
| Fidelity Select Utilities | FSUTX |
| Fidelity Select Wireless | FWRLX |
| Fidelity Spartan Extended Market Index ADV | FSEVX |
| Fidelity Spartan Intermediate Treasury Index ADV | FIBAX |
| Fidelity Spartan Long Term Treasury Bond Index ADV | FLBAX |
| Fidelity Spartan Short Term Treasury Index ADV | FSBAX |
| Fidelity Stock  Selector All Cap K | FSSKX |

| Fund Name | Ticker |
|---|---|
| Fidelity Stock  Selector Large Cap Value | FSLVX |
| Fidelity Strategic Dividend & Income | FSDIX |
| Fidelity Strategic Income | FSICX |
| Fidelity Strategic Real Return | FSRRX |
| Fidelity Telecom & Utilities | FIUIX |
| Fidelity Treasury Only Money Market | FDLXX |
| Fidelity Trend | FTRNX |
| Fidelity US Government Reserves | FGRXX |
| Fidelity Value  K | FVLKX |
| Fidelity Value Strategies K | FVSKX |
| Prudential American Funds American Balanced R3 (mutual fund) | RLBCX |
| Prudential Medley Capital Growth Annuity | VCA-10 |
| Prudential Columbia Seligman Communication & Income A (mutual fund) | SLMCX |
| Prudential DWS Small Cap Value A (mutual fund) | KDSAX |
| Prudential Financial Services Z (mutual fund) | PFSZX |
| Prudential Medley Global Annuity | VCA-24 |
| Prudential Global Real Estate Z (mutual fund) | PURZX |
| Prudential Goldman Sachs Mid Cap Value A (mutual fund) | GCMAX |
| Prudential American Funds Growth Fund of America R3 (mutual fund) | RGACX |
| Prudential Jennison Mid Cap Growth Z (mutual fund) | PEGZX |
| Prudential Jennison Nat Resources Z (mutual fund) | PNRZX |
| Prudential Jennison Value Z (mutual fund) | PEIZX |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|---|---|
| Prudential Legg Mason  ClearBridge Small Cap Growth A (mutual fund) | SASMX |
| Prudential MFS Value A (mutual fund) | MEIAX |
| Prudential Medley Money Market Annuity | VCA-11 |
| Prudential Oppenheimer Global Allocation A (mutual fund) | QVGIX |
| Prudential PIMCO Total Return A (mutual fund) | PTTAX |
| Prudential Stock Index Z (mutual fund) | PSIFX |
| TIAA Real Estate | QREARX |
| TIAA-CREF American Funds Washington Mutual R6 | RWMGX |
| TIAA-CREF Large-Cap Value INST | TRLIX |
| TIAA-CREF Lifecycle 2015 INST | TCNIX |
| TIAA-CREF Lifecycle 2020 INST | TCWIX |
| TIAA-CREF Lifecycle 2025 INST | TCYIX |
| TIAA-CREF Lifecycle 2030 INST | TCRIX |
| TIAA-CREF Lifecycle 2035 INST | TCIIX |
| TIAA-CREF Lifecycle 2040 INST | TCOIX |
| TIAA-CREF Lifecycle 2045 INST | TTFIX |
| TIAA-CREF Lifecycle 2050 INST | TFTIX |
| TIAA-CREF Mid-Cap Growth INST | TRPWX |
| TIAA-CREF Mid-Cap Value INST | TIMVX |
| Vanguard 500 Index INV | VFINX |
| Vanguard Admiral Treasury Money Market INV | VUSXX |
| Vanguard Capital Value INV | VCVLX |
| Vanguard Diversified Equity INV | VDEQX |
| Vanguard Dividend Appreciation Index INV | VDAIX |

| Fund Name | Ticker |
|---|---|
| Vanguard Dividend Growth INV | VDIGX |
| Vanguard Energy INV | VGENX |
| Vanguard Explorer INV | VEXPX |
| Vanguard Extended Market Index INV | VEXMX |
| Vanguard Federal Money Market INV | VMFXX |
| Vanguard Inflation-Protected Securities INV | VIPSX |
| Vanguard Intermediate-Term Bond Index INV | VBIIX |
| Vanguard Intermediate-Term Investment-Grade INV | VFICX |
| Vanguard International Explorer INV | VINEX |
| Vanguard Large-Cap Index INV | VLACX |
| Vanguard LifeStrategy Growth INV | VASGX |
| Vanguard Long-Term Bond Index INV | VBLTX |
| Vanguard Mid Cap Index INV | VIMSX |
| Vanguard Mid-Cap Growth Index INV | VMGIX |
| Vanguard Mid-Cap Value Index INV | VMVIX |
| Vanguard Morgan Growth INV | VMRGX |
| Vanguard Pacific Stock Index INV | VPACX |
| Vanguard Precious Metals and Mining INV | VGPMX |
| Vanguard Prime Money Market INV | VMMXX |
| Vanguard REIT Index INV | VGSIX |
| Vanguard Selected Value INV | VASVX |
| Vanguard Short-Term Bond Index INV | VBISX |
| Vanguard Short-Term Federal INV | VSGBX |
| Vanguard Short-Term Investment-Grade INV | VFSTX |
| Vanguard Short-Term Treasury INV | VFISX |
| Vanguard Small Cap Index INV | NAESX |

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

| Fund Name | Ticker |
|-----------|--------|
| Vanguard Small Cap Value Index INV | VISVX |
| Vanguard Total Bond Market Index INV | VBMFX |
| Vanguard Wellington INV | VWELX |

259.   Had Defendants conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plans or replaced. Defendants' failure to do so caused the Plans substantial losses compared to prudent alternative investments that were available to the Plans.

## C.   The CREF Stock and TIAA Real Estate Accounts.

260.   Two funds in particular further demonstrate the severe harm to the Plans resulting from Defendants' breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

### 1.   Defendants disloyally and imprudently retained the CREF Stock Account.

261.   TIAA imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. In its fund fact sheets and participant disclosures to the Plans' participants, TIAA classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. It also reported this Morningstar category to the Committee as early as 2010.

262.   For its benefit, TIAA required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plans, and acting for the sole benefit of the Plans' participants, as ERISA requires, Defendants allowed TIAA to continue to dictate that the CREF Stock Account would be placed and retained in the Plans. Defendants did so without a prudent process to determine whether there were other prudent alternatives in the

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

exclusive best interest of Plan participants and beneficiaries. TIAA required the CREF Stock Account to be continued to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA for recordkeeping services. The CREF Stock Account paid up to 24 bps for revenue sharing, which exceeded other TIAA investments by over 50% (15 bps).

263.   The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform the benchmark TIAA and Defendants told participants was the proper one, and underperformed lower-cost actively and passively managed investments that were available to the Plans, yet has not been removed from the Plans nor frozen to new investments. The CREF Stock Account is one of the largest investment options in the Plans with over $550 million in total assets, and has been offered in the Plans throughout the period from 2010 to date.

264.   As understood in the investment community, passively managed investment options should either be used or, at a minimum, be thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth above. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

265.   Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F.

Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[72] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

266.   To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

267.   If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

268.   Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even

---

[72] http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

exists, that will outperform its benchmark over time, net of investment expenses.

269.   Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. Fin. 549, 571 (1995).[73]

270.   Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P

---

[73] http://indeksirahastot.fi/resource/malkiel.pdf.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

500 Index fund.

****

Most of the dismal comparisons for active managers are

for large-cap domestic managers versus the S&P 500

Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

271.   Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

272.   Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be retained in the Plans. Before USC hired CAPTRUST, Defendants never evaluated whether the CREF Stock Account should be retained in the Plans despite its history of underperformance. This is particularly true given TIAA's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA. By acceding to TIAA's demand that the CREF Stock Account be maintained as a Plan investment, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans.

273.   Additionally, as detailed above, the fee that the CREF Stock Account charged comprised four layers of fees that were each unreasonable compared to the actual services provided by TIAA to the Plans' participants. Defendants failed to

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plans collectively invested over *$550 million* in the CREF Stock Account.

274.    Had Defendants engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

275.    The CREF Stock Account did not merely experience poor performance in a single year or two, but rather its historical performance has been persistently poor for many years compared to both available lower-cost index funds, CREF's Composite benchmark, and the Russell 3000 index benchmark. Defendants and TIAA identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results to the Plans' participants.

276.    Defendants were specifically informed that the CREF Stock Account underperformed its composite benchmark for the 1-, 3-, 5-, and 10-year periods ending June 30, 2010. It similarly underperformed that benchmark over the preceding 5 and 10 years as of December 31, 2009.[74] And from 2002 through 2009, the fund underperformed that benchmark in 6 of the 8 years.

277.    The CREF Stock Account also underperformed actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[75]

---

[74] College Retirement Equities Fund 2009 Annual Report, https://www.sec.gov/Archives/edgar/data/777535/000093041310001259/c59810_ncsr.htm#B006.
[75] For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102



278.   Despite the consistent underperformance, the CREF Stock Account with an expense ratio of 49 bps as of December 31, 2009 was more expensive than better performing actively managed alternatives: Vanguard PRIMECAP (Adm) (37 bps) and Vanguard Capital Opp. (Adm) (41 bps). It was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst) (6 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

279.   Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

2012).[76] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

280.   The Supreme Court has unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and remove it despite underperforming lower-cost investment alternatives that were readily available to the Plans.

281.   Defendants' imprudent and disloyal inclusion and retention of the CREF Stock Account caused the Plans to lose over $182 million compared to what the Plans would have earned had the same amount of assets been in a lower-cost prudent alternative, such as the Vanguard Total Stock Market Index.[77]

## 2.   Defendants disloyally and imprudently retained the TIAA Real Estate Account.

282.   Defendants selected and continue to retain the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

---

[76] http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

[77] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternative to compensate participants who have not been reimbursed for their losses. Even if the Plans' losses were measured by the performance of a 70% allocation to the Vanguard Total Stock Market Index and a 30% allocation to the Vanguard Total International Stock Index Fund, the Plans lost in excess of $16 million.

283.   With an expense ratio of 101 bps as of December 31, 2009, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Inst) with an expense ratio of 10 bps.

284.   The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[78] Despite this, Defendants selected and to date retain it in the Plans.



//
//
//
//
//
//

[78] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102





285.   In retaining this fund during 2010, Defendants did not even compare the TIAA Real Estate Account's relative performance to any benchmark index or percentile rankings. Had they done so, they would have readily discovered its

significant underperformance. For instance, as of March 31, 2010, the TIAA Real Estate Account ranked *at the very bottom of peer funds* – 100th percentile of its 800 to 1000 peer funds for 1-, 5-, and 10-year periods.[79]

286.   As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

287.   Defendants' imprudent and disloyal inclusion and retention of the TIAA Real Estate Account caused the Plans in excess of $6 million compared to what the Plans would have earned had the same amount of assets been invested in the lower-cost and better-performing Vanguard REIT Index (Inst).[80]

## CLASS ACTION ALLEGATIONS

288.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

289.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

All participants and beneficiaries of the University of

[79] *Sacerdote v. New York University,* Tr. Ex. PX0034, page 54 (CL00008036); *Sacerdote v. New York Univ.*, No. 16-6284, Docs. 253-106, 253-107 (S.D. N.Y.).
[80] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Inst) to compensate participants who have not been reimbursed for their losses.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

Southern California Defined Contribution Retirement Plan and the University of Southern California Tax-Deferred Annuity Plan from August 17, 2010, through the date of judgment, excluding the Defendants.

290.  This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.  The Class includes over 28,000 members and is so large that joinder of all its members is impracticable.

b.  There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.  Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.  Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of

(A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

291.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

292.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 30 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). In that same case, Chief Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b.       Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

c.       "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

d.       "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

e.      U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

g.      The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

committed to the interests of the participants and
beneficiaries of the General Dynamics 401(k)
Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

       h.      Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc*., 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national
> contribution made by the Plaintiffs whose litigation
> clarified ERISA standards in the context of investment
> fees. The litigation educated plan administrators, the
> Department of Labor, the courts and retirement plan
> participants about the importance of monitoring
> recordkeeping fees and separating a fiduciary's corporate
> interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

       i.      In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and

substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

j.   In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

k.   On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

l.   Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

m.      The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.,* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[81] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[82] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[83] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[84] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[85] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015);[86] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[87] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[88] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*,

---

[81] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[82] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[83] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[84] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[85] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[86] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[87] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[88] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

1
2

BLOOMBERG (Oct. 2, 2014);[89] Anne Tergesen, *The Lawyer on a Quest to Lower Your 401(k) Fees*, Wall St. J. (June 9, 2017).[90]

3

## COUNT I

4
5
6
7

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Continued Locking the Plans into CREF Stock Account and TIAA Recordkeeping**

293.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

8
9
10
11
12
13

294.   Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and fulfilling their role as fiduciaries of the Plans with the care, skill, prudence, and diligence required by ERISA.

14
15
16
17
18
19

295.   Defendants were required to independently assess "the prudence of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plans' participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendants were also required to remove investments that were no longer prudent for the Plans, as the Supreme Court confirmed. *Tibble*, 135 S. Ct. at 1828–29.

20
21
22
23
24
25

296.   By allowing TIAA to mandate the retention of the CREF Stock Account and Money Market Account in the Plans, and to continue to require that it provide recordkeeping for its proprietary options, Defendants committed the Plans to an imprudent arrangement in which certain investments had to be maintained in the Plans *even if they were no longer prudent investments*, and prevented the Plans

26
27

[89] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

[90] https://www.wsj.com/articles/the-lawyer-on-a-quest-to-lower-your-401k-fees-1497000607.

28

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendants abdicated their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By continuing to allow TIAA to dictate these terms, Defendants favored the financial interests of TIAA in receiving a steady stream of revenues from TIAA's proprietary funds over the interest of participants.

297. Because Defendants continued to cause the Plans to maintain the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendants are liable to make good to the Plans all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plans suffered massive losses from the retention of the CREF Stock Account in the Plans compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plans, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

298. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Continued Locking the Plans into CREF Stock Account and TIAA Recordkeeping

299. Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

300.   Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *
>
> (C)   furnishing of goods, services, or facilities between the plan and  party in interest;
>
> (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

29 U.S.C. §1106(a)(1).

301.   Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plans, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

302.   By causing or allowing the Plans to continue to be locked into an unreasonable arrangement that required the Plans to maintain the CREF Stock Account and to retain TIAA as recordkeeper for its proprietary products, Defendants caused the Plans to engage in transactions that it knew or should have known constituted an exchange of property between the Plans and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a furnishing of services between the Plans and TIAA prohibited by 29 U.S.C. §1106(a)(1)(C), or a transfer of Plan assets to, or use by or for the benefit of TIAA prohibited by 29 U.S.C. §1106(a)(1)(D). These

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

transactions occurred each time the Plans paid fees to TIAA in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

303.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions and to disgorge or provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

304.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT III

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Administrative Fees

305.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

306.   Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

307.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George,* 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying …

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

308.   Defendants' process for monitoring and controlling the Plans' recordkeeping fees was a fiduciary breach in that Defendants failed to: monitor the amount of the revenue sharing received by the Plans' recordkeepers, determine if those amounts were competitive or reasonable for the services provided to the Plans, or use the Plans' size to reduce fees or obtain sufficient rebates to the Plans for the excessive fees paid by participants. Moreover, Defendants failed to solicit competitive bids from competing providers on a flat per-participant fee basis. As the Plans' assets grew, the asset-based revenue sharing payments to the Plans' recordkeepers grew or were maintained at unreasonable levels, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

309.   Defendants also failed to account for the fact that TIAA, Fidelity, Vanguard, and Prudential used their position as recordkeepers to obtain access to participants, gaining valuable information including participants' contact information, their choices of investments, the size of their accounts, their employment status, and their age among other things. Defendants allowed these service providers to then use this information to sell lucrative products to Plan participants as they neared retirement age without receiving any compensation for the use of this valuable, personal information. This information was even more lucrative for the service providers because Defendants are using these service providers as recordkeepers and are offering their products in the Plans to participants.

310.   By allowing TIAA, Fidelity, Vanguard, and Prudential to put their

proprietary investments in the Plans without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendants failed to act in the exclusive interest of participants.

311.   In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decision making process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider. Instead, until as recently as March 2016 Defendants retained four recordkeepers to provide recordkeeping services, and since then have continued to retain three recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a reasonable cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action— under circumstances in which a prudent fiduciary would have done so"—and, indeed, did so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

312.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

313.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

314.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

## COUNT IV

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Unreasonable Administrative Fees

315.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

316.   As service providers to the Plans, TIAA-CREF, Fidelity, Vanguard, and Prudential are parties in interest. 29 U.S.C. §1002(14)(B).

317.   By causing the Plans to use TIAA, Fidelity, Vanguard, and Prudential as the Plans' recordkeepers from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plans and TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(A), a furnishing of services between the Plans and TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to or a transfer of Plan assets to, or use by or for the benefit of TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA, Fidelity, Vanguard, and Prudential in connection with the Plans' investments in funds that paid revenue sharing to TIAA, Fidelity, Vanguard, and Prudential.

318.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions and to disgorge or provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

319.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each

Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT V

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Underperforming and Unreasonably Expensive Investment Options**

320.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

321.   Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plans' assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plans' investments on an ongoing basis and to "remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1829.

322.   These duties required Defendants to independently assess whether each option was a prudent choice for the Plans, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plans' menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

323.   In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plans, the recordkeepers' financial interest in having their proprietary investment products included in the Plans, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; id. § 90 cmt. h(2).

324.   Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

poor performance relative to other investment options that were readily available to the Plans at all relevant times.

325.   Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA, Fidelity and Vanguard, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

326.   Rather than consolidating the Plans' over 350 investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, and in such a number that Defendants could not and did not prudently monitor them, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. Defendants themselves admitted that participants were "overwhelmed" by such a large number of funds. Defendants also used higher-cost class shares for the Plans' mutual funds when lower-cost class shares were available for the identical mutual fund.

327.   The Plans' investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities. Nearly all of the Plans' options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plans, which Defendants failed to consider.

328.   In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

participants. Defendants therefore failed to discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

329.   Defendants failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans.

330.   Underperforming funds over the trailing 3-year and/or 5-year periods: Defendants retained historically underperforming funds compared to both passively managed investments and actively managed investments, including those that were recommended to be removed from the Plans by USC's investment advisor.

331.   Sector funds: Defendants retained unreasonably risky and undiversified investments concentrated in a single sector, referred to as sector funds. These investments were imprudent based on the Plans' characteristics and investment objectives, as confirmed by USC's investment advisor when it recommended the removal of these funds.

332.   CREF Stock Account: Defendants retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark.

333.   TIAA Real Estate Account: Defendants retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

334.   Had Defendants engaged in a prudent investment review process, it

SCHLICHTER BOGARD &amp; DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

would have concluded that these options were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and thus should be removed from the Plans or, at a minimum, frozen to new investments.

335.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

336.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

337.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT VI

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Unreasonable investment management fees, unnecessary marketing and distribution (12b-1) fees and mortality and expense risk fees.

338.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

339.   As the plan's providers of investment services, TIAA, Fidelity, Vanguard, and Prudential are parties in interest. 29 U.S.C. §1002(14)(B).

340.   By including and/or retaining in the Plans investment options managed by TIAA, Fidelity, Vanguard and Prudential, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

exchange of property between the Plans and TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(A); a furnishing of services between the Plans and TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(C); and a transfer of the Plans' assets to, or use by or for the benefit of TIAA, Fidelity, Vanguard, and Prudential prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA, Fidelity, Vanguard, and Prudential in connection with the Plans' investments in TIAA, Fidelity, Vanguard, and Prudential investment options.

341.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions and to disgorge or provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

342.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT VII

### Failure to Monitor Fiduciaries

343.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

344.   USC has the fiduciary responsibility to control and manage the operation and administration of the Plans, including the selection of service providers for the Plans, with all powers necessary to enable it to properly carry out such responsibilities.

345.   The Plans authorized USC to delegate certain of its fiduciary duties. USC purportedly delegated certain fiduciary responsibilities to the Committee in

accordance with the Committee Charter implemented in 2016. Despite this delegation, it retained responsibility to monitor the actions of the Committee to ensure that it complied with its fiduciary obligations. Before 2016, the Committee was purportedly tasked with reviewing the Plans' investment options and evaluating the expenses charged to the Plans, among other tasks. It was supposed to advise USC's Senior Vice President for Administration on matters related to the Plans and make recommendations on changes to the investment policy, service providers, products, and services. Based on the Committee minutes and meeting materials, the Committee did not report on the Plans' investment options and expenses or any actions recommended to be taken on behalf of the Plans to USC's Board of Trustees (or Cabinet) until 2015 in connection with the Plans' new investment structure.

346.   To the extent USC disclaims responsibility for any of the actions or omissions alleged in the preceding counts based on having delegated its responsibilities to a third party, it remains liable for failing to monitor its delegate. 29 U.S.C. §1105(a), (c)(2).

347.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

348.   To the extent any of USC's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

349.   USC breached its fiduciary monitoring duties by, among other things:

   a.   Failing to monitor the Committee and its individual members, to evaluate their performance, and to have a system in place to review their

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

performance at reasonable intervals to ensure they complied with their fiduciary obligations;

      b.      Failing to monitor the Committee's fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the Committee's failure to monitor the Plans' underperforming investments and the unreasonable compensation paid to the recordkeepers through revenue sharing were so obvious and prolonged that a prudent fiduciary would have intervened and replaced those who were administering the Plans with competent and prudent fiduciaries;

      c.      Failing to ensure that the Committee had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were reasonable, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

      d.      Failing to ensure that the Committee considered the ready availability of comparable and better performing investment options, particularly after they were repeatedly informed of underperforming funds in the Plans; and

      e.      Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

350.   Had USC discharged its fiduciary monitoring duties prudently as described above, the Plans would not have suffered those losses. Therefore, as a

direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

351.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached its fiduciary duties as described above;
- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;
- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;
- Order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;
- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);
- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- Reform the Plans to include only prudent investments;
- Order Defendants to put the Plans' recordkeeping and administrative services out to competitive bidding and to ensure that only reasonable recordkeeping expenses are paid by the Plans;

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102

- Require the fiduciaries to select investments and service providers based solely on the merits of those selections, and avoid bundling funds or products serving the interests of the recordkeepers and other service providers;

- Order that the Plans' recordkeepers are prohibited from marketing and selling non-Plan products and services to Plan participants;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Award the Plans lost investment opportunity on their losses caused by Defendants breaches through the date of satisfaction of judgment; and

- Grant other equitable or remedial relief as the Court deems appropriate.

July 12, 2019                          Respectfully submitted,

                                       s/ Jerome J. Schlichter
                                       SCHLICHTER, BOGARD & DENTON LLP
                                       Jerome J. Schlichter
                                       100 South Fourth Street; Suite 1200
                                       St. Louis, Missouri 63102
                                       Telephone: (314) 621-6115
                                       Facsimile: (314) 621-5934
                                       jschlichter@uselaws.com
                                       Attorneys for Plaintiffs

SCHLICHTER BOGARD & DENTON
ATTORNEYS AT LAW
100 S. 4TH STREET, STE 1200
ST. LOUIS, MO 63102